# DAMES & MOORE *v.* REGAN, SECRETARY OF TREASURY, ET AL.

No. 80–2078.   Argued June 24, 1981—Decided July 2, 1981

656

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined; in all but n. 6 of which POWELL, J., joined; and in all but Part V of which STEVENS, J., joined. STEVENS, J., filed an opinion concurring in part, *post*, p. 690. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 690.

*C. Stephen Howard* argued the cause for petitioner. With him on the briefs were *Raymond C. Fisher* and *Stanley C. Fickle.*

*Rex E. Lee* argued the cause for the federal respondents. On the briefs were *Solicitor General McCree, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Geller, Edwin S. Kneedler, Robert E. Kopp,* and *Michael F. Hertz.*

*Thomas G. Shack, Jr.,* argued the cause for intervenor-respondent Islamic Republic of Iran. With him on the briefs were *Raymond J. Kimball* and *Christine Cook Nettsheim. Eric M. Lieberman* argued the cause for intervenor-respondent Bank Markazi Iran. With him on the briefs were *Leon-*

*ard B. Boudin, Gordon J. Johnson, Michael Krinsky, Ellen J. Winner, Edward Copeland,* and *Judith Levin. Elihu Inselbuch* filed a brief for intervenor-respondent Atomic Energy Organization of Iran.*

JUSTICE REHNQUIST delivered the opinion of the Court.

The questions presented by this case touch fundamentally upon the manner in which our Republic is to be governed. Throughout the nearly two centuries of our Nation's existence under the Constitution, this subject has generated considerable debate. We have had the benefit of commentators such as John Jay, Alexander Hamilton, and James Madison writing in The Federalist Papers at the Nation's very inception, the benefit of astute foreign observers of our system such as

---

*Briefs of *amici curiae* urging reversal were filed by *Carol Goodman* and *Samuel Hoar* for Chas. T. Main International, Inc.; by *Gerald M. Singer* for Daniel, Mann, Johnson & Mendenhall; and by *Edward N. Costikyan* and *George P. Felleman* for Marschalk Co., Inc.

*Daniel P. Levitt, Michael S. Oberman, Greg A. Danilow, Alan R. Friedman,* and *Martin S. Zohn* filed a brief for Bank Melli Iran et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *David Ginsburg, Lee R. Marks, Alan S. Weitz, James A. DeBois,* and *Frank M. Steadman, Jr.,* for American Bell International Inc.; by *Thomas W. Luce III, M. David Bryant, Jr., Eugene Zemp DuBose, Monroe Leigh,* and *Michael Sandler* for Electronic Data Systems Corporation Iran; by *Brice M. Clagett* and *Paul G. Gaston* for FLAG, Inc.; by *Bartlett H. McGuire, Karen E. Wagner, George M. Duff III, Ralph L. McAfee, George F. Hritz, Robert B. von Mehren, Richard J. Medalie, Joseph S. Hellman, Norman R. Nelson, Richard C. Tufaro, A. H. Wilcox, Gilbert J. Helwig, John E. Hoffman, Jr., Thomas W. Cashel, Edwin McAmis, John W. Dickey, Michael M. Maney,* and *Peter H. Kaminer* for Morgan Guaranty Trust Company of New York; by *Michael Burrows, Robert B. Davidson, Lawrence W. Newman, David R. Hyde, Michael P. Tierney, Powell Pierpoint, Joseph S. Hellman, Kurt J. Wolff, Jeremiah D. Lambert, William Coston, Edward A. Woolley, James Schreiber,* and *James M. McHale* for Reading & Bates Corp. et al.; by *Alan Raywid* and *Margaret E. Rolnick* for Sperry Corp. et al.; by *John Carey* and *Jerry L. Siegel* for Sylvania Technical Systems, Inc.; and by *Alan I. Rothenberg* and *Robert E. Mangels* for Jerry Plotkin.

Alexis de Tocqueville and James Bryce writing during the first century of the Nation's existence, and the benefit of many other treatises as well as more than 400 volumes of reports of decisions of this Court. As these writings reveal it is doubtless both futile and perhaps dangerous to find any epigrammatical explanation of how this country has been governed. Indeed, as Justice Jackson noted, "[a] judge . . . may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power as they actually present themselves." *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 634 (1952) (concurring opinion).

Our decision today will not dramatically alter this situation, for the Framers "did not make the judiciary the overseer of our government." *Id.,* at 594 (Frankfurter, J., concurring). We are confined to a resolution of the dispute presented to us. That dispute involves various Executive Orders and regulations by which the President nullified attachments and liens on Iranian assets in the United States, directed that these assets be transferred to Iran, and suspended claims against Iran that may be presented to an International Claims Tribunal. This action was taken in an effort to comply with an Executive Agreement between the United States and Iran. We granted certiorari before judgment in this case, and set an expedited briefing and argument schedule, because lower courts had reached conflicting conclusions on the validity of the President's actions and, as the Solicitor General informed us, unless the Government acted by July 19, 1981, Iran could consider the United States to be in breach of the Executive Agreement.

But before turning to the facts and law which we believe determine the result in this case, we stress that the expeditious treatment of the issues involved by all of the courts which have considered the President's actions makes us acutely aware of the necessity to rest decision on the narrowest possible ground capable of deciding the case. *Ashwander* v. *TVA,*

297 U. S. 288, 347 (1936) (Brandeis, J., concurring). This does not mean that reasoned analysis may give way to judicial fiat. It does mean that the statement of Justice Jackson—that we decide difficult cases presented to us by virtue of our commissions, not our competence—is especially true here. We attempt to lay down no general "guidelines" covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case.

Perhaps it is because it is so difficult to reconcile the foregoing definition of Art. III judicial power with the broad range of vitally important day-to-day questions regularly decided by Congress or the Executive, without either challenge or interference by the Judiciary, that the decisions of the Court in this area have been rare, episodic, and afford little precedential value for subsequent cases. The tensions present in any exercise of executive power under the tripartite system of Federal Government established by the Constitution have been reflected in opinions by Members of this Court more than once. The Court stated in *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319–320 (1936):

> "[W]e are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution."

And yet 16 years later, Justice Jackson in his concurring opinion in *Youngstown, supra,* which both parties agree brings together as much combination of analysis and common sense as there is in this area, focused not on the "plenary and ex-

clusive power of the President" but rather responded to a claim of virtually unlimited powers for the Executive by noting:

> "The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image." 343 U. S., at 641.

As we now turn to the factual and legal issues in this case, we freely confess that we are obviously deciding only one more episode in the never-ending tension between the President exercising the executive authority in a world that presents each day some new challenge with which he must deal and the Constitution under which we all live and which no one disputes embodies some sort of system of checks and balances.

## I

On November 4, 1979, the American Embassy in Tehran was seized and our diplomatic personnel were captured and held hostage. In response to that crisis, President Carter, acting pursuant to the International Emergency Economic Powers Act, 91 Stat. 1626, 50 U. S. C. §§ 1701–1706 (1976 ed., Supp. III) (hereinafter IEEPA), declared a national emergency on November 14, 1979,[1] and blocked the removal or transfer of "all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to

---

[1] Title 50 U. S. C. § 1701 (a) (1976 ed., Supp. III) states that the President's authority under the Act "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Petitioner does not challenge President Carter's declaration of a national emergency.

the jurisdiction of the United States . . . ." Exec. Order No. 12170, 3 CFR 457 (1980), note following 50 U. S. C. § 1701 (1976 ed., Supp. III).[2] President Carter authorized the Secretary of the Treasury to promulgate regulations carrying out the blocking order. On November 15, 1979, the Treasury Department's Office of Foreign Assets Control issued a regulation providing that "[u]nless licensed or authorized . . . any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since [November 14, 1979,] there existed an interest of Iran." 31 CFR § 535.203 (e) (1980). The regulations also made clear that any licenses or authorizations granted could be "amended, modified, or revoked at any time." § 535.805.[3]

On November 26, 1979, the President granted a general license authorizing certain judicial proceedings against Iran but which did not allow the "entry of any judgment or of any decree or order of similar or analogous effect . . . ." § 535.504 (a). On December 19, 1979, a clarifying regulation was issued stating that "the general authorization for judicial proceedings contained in § 535.504 (a) includes pre-judgment attachment." § 535.418.

On December 19, 1979, petitioner Dames & Moore filed suit in the United States District Court for the Central District of California against the Government of Iran, the Atomic

---

[2] Title 50 U. S. C. § 1702 (a)(1)(B) (1976 ed., Supp. III) empowers the President to

"investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . ."

[3] Title 31 CFR § 535.805 (1980) provides in full: "The provisions of this part and any rulings, licenses, authorizations, instructions, orders, or forms issued thereunder may be amended, modified, or revoked at any time."

Energy Organization of Iran, and a number of Iranian banks. In its complaint, petitioner alleged that its wholly owned subsidiary, Dames & Moore International, S. R. L., was a party to a written contract with the Atomic Energy Organization, and that the subsidiary's entire interest in the contract had been assigned to petitioner. Under the contract, the subsidiary was to conduct site studies for a proposed nuclear power plant in Iran. As provided in the terms of the contract, the Atomic Energy Organization terminated the agreement for its own convenience on June 30, 1979. Petitioner contended, however, that it was owed $3,436,694.30 plus interest for services performed under the contract prior to the date of termination.[4] The District Court issued orders of attachment directed against property of the defendants, and the property of certain Iranian banks was then attached to secure any judgment that might be entered against them.

On January 20, 1981, the Americans held hostage were released by Iran pursuant to an Agreement entered into the day before and embodied in two Declarations of the Democratic and Popular Republic of Algeria. Declaration of the Government of the Democratic and Popular Republic of Algeria (App. to Pet. for Cert. 21–29), and Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (*id.*, at 30–35). The Agreement

---

[4] The contract stated that any dispute incapable of resolution by agreement of the parties would be submitted to conciliation and that, if either party was unwilling to accept the results of conciliation, "the matter shall be decided finally by resort to the courts of Iran." Pet. for Cert. 7, n. 2. In its complaint, which was based on breach of contract and related theories, petitioner alleged that it had sought a meeting with the Atomic Energy Organization for purposes of settling matters relating to the contract but that the Organization "has continually postponed [the] meeting and obviously does not intend that it take place." Complaint in *Dames & Moore* v. *Atomic Energy Organization of Iran*, No. CV 79–04918 LEW (Px) (CD Cal.), ¶ 27.

stated that "[i]t is the purpose of [the United States and Iran] . . . to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." *Id.,* at 21–22. In furtherance of this goal, the Agreement called for the establishment of an Iran-United States Claims Tribunal which would arbitrate any claims not settled within six months. Awards of the Claims Tribunal are to be "final and binding" and "enforceable . . . in the courts of any nation in accordance with its laws." *Id.,* at 32. Under the Agreement, the United States is obligated

> "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." *Id.,* at 22.

In addition, the United States must "act to bring about the transfer" by July 19, 1981, of all Iranian assets held in this country by American banks. *Id.,* at 24–25. One billion dollars of these assets will be deposited in a security account in the Bank of England, to the account of the Algerian Central Bank, and used to satisfy awards rendered against Iran by the Claims Tribunal. *Ibid.*

On January 19, 1981, President Carter issued a series of Executive Orders implementing the terms of the agreement. Exec. Orders Nos. 12276–12285, 46 Fed. Reg. 7913–7932. These Orders revoked all licenses permitting the exercise of "any right, power, or privilege" with regard to Iranian funds, securities, or deposits; "nullified" all non-Iranian interests in such assets acquired subsequent to the blocking order of November 14, 1979; and required those banks holding Iranian assets to transfer them "to the Federal Reserve Bank of New

York, to be held or transferred as directed by the Secretary of the Treasury." Exec. Order No. 12279, 46 Fed. Reg. 7919.

On February 24, 1981, President Reagan issued an Executive Order in which he "ratified" the January 19th Executive Orders. Exec. Order No. 12294, 46 Fed. Reg. 14111. Moreover, he "suspended" all "claims which may be presented to the . . . Tribunal" and provided that such claims "shall have no legal effect in any action now pending in any court of the United States." *Ibid.* The suspension of any particular claim terminates if the Claims Tribunal determines that it has no jurisdiction over that claim; claims are discharged for all purposes when the Claims Tribunal either awards some recovery and that amount is paid, or determines that no recovery is due. *Ibid.*

Meanwhile, on January 27, 1981, petitioner moved for summary judgment in the District Court against the Government of Iran and the Atomic Energy Organization, but not against the Iranian banks. The District Court granted petitioner's motion and awarded petitioner the amount claimed under the contract plus interest. Thereafter, petitioner attempted to execute the judgment by obtaining writs of garnishment and execution in state court in the State of Washington, and a sheriff's sale of Iranian property in Washington was noticed to satisfy the judgment. However, by order of May 28, 1981, as amended by order of June 8, the District Court stayed execution of its judgment pending appeal by the Government of Iran and the Atomic Energy Organization. The District Court also ordered that all prejudgment attachments obtained against the Iranian defendants be vacated and that further proceedings against the bank defendants be stayed in light of the Executive Orders discussed above. App. to Pet. for Cert. 106–107.

On April 28, 1981, petitioner filed this action in the District Court for declaratory and injunctive relief against the United States and the Secretary of the Treasury, seeking to

prevent enforcement of the Executive Orders and Treasury Department regulations implementing the Agreement with Iran. In its complaint, petitioner alleged that the actions of the President and the Secretary of the Treasury implementing the Agreement with Iran were beyond their statutory and constitutional powers and, in any event, were unconstitutional to the extent they adversely affect petitioner's final judgment against the Government of Iran and the Atomic Energy Organization, its execution of that judgment in the State of Washington, its prejudgment attachments, and its ability to continue to litigate against the Iranian banks. *Id.,* at 1–12. On May 28, 1981, the District Court denied petitioner's motion for a preliminary injunction and dismissed petitioner's complaint for failure to state a claim upon which relief could be granted. *Id.,* at 106–107. Prior to the District Court's ruling, the United States Courts of Appeals for the First and the District of Columbia Circuits upheld the President's authority to issue the Executive Orders and regulations challenged by petitioner. See *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water & Power Authority,* 651 F. 2d 800 (CA1 1981); *American Int'l Group, Inc.* v. *Islamic Republic of Iran,* 211 U. S. App. D. C. 468, 657 F. 2d 430 (1981).

On June 3, 1981, petitioner filed a notice of appeal from the District Court's order, and the appeal was docketed in the United States Court of Appeals for the Ninth Circuit. On June 4, the Treasury Department amended its regulations to mandate "the transfer of bank deposits and certain other financial assets of Iran in the United States to the Federal Reserve Bank of New York by noon, June 19." App. to Pet. for Cert. 151–152. The District Court, however, entered an injunction pending appeal prohibiting the United States from requiring the transfer of Iranian property that is subject to "any writ of attachment, garnishment, judgment, levy, or other judicial lien" issued by any court in favor of petitioner. *Id.,* at 168. Arguing that this is a case of "imperative public importance," petitioner then sought a writ of certiorari be-

fore judgment. Pet. for Cert. 10. See 28 U. S. C.' § 2101 (e); this Court's Rule 18. Because the issues presented here are of great significance and demand prompt resolution, we granted the petition for the writ, adopted an expedited briefing schedule, and set the case for oral argument on June 24, 1981. 452 U. S. 932 (1981).

## II

The parties and the lower courts, confronted with the instant questions, have all agreed that much relevant analysis is contained in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952). Justice Black's opinion for the Court in that case, involving the validity of President Truman's effort to seize the country's steel mills in the wake of a nationwide strike, recognized that "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.,* at 585. Justice Jackson's concurring opinion elaborated in a general way the consequences of different types of interaction between the two democratic branches in assessing Presidential authority to act in any given case. When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Id.,* at 637. When the President acts in the absence of congressional authorization he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Ibid.* In such a case the analysis becomes more complicated, and the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action, including "con-

gressional inertia, indifference or quiescence." *Ibid.* Finally, when the President acts in contravention of the will of Congress, "his power is at its lowest ebb," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject." *Id.,* at 637–638.

Although we have in the past found and do today find Justice Jackson's classification of executive actions into three general categories analytically useful, we should be mindful of Justice Holmes' admonition, quoted by Justice Frankfurter in *Youngstown, supra,* at 597 (concurring opinion), that "[t]he great ordinances of the Constitution do not establish and divide fields of black and white." *Springer* v. *Philippine Islands,* 277 U. S. 189, 209 (1928) (dissenting opinion). Justice Jackson himself recognized that his three categories represented "a somewhat over-simplified grouping," 343 U. S., at 635, and it is doubtless the case that executive action in any particular instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition. This is particularly true as respects cases such as the one before us, involving responses to international crises the nature of which Congress can hardly have been expected to anticipate in any detail.

### III

In nullifying post-November 14, 1979, attachments and directing those persons holding blocked Iranian funds and securities to transfer them to the Federal Reserve Bank of New York for ultimate transfer to Iran, President Carter cited five sources of express or inherent power. The Government, however, has principally relied on § 203 of the IEEPA, 91 Stat. 1626, 50 U. S. C. § 1702 (a)(1) (1976 ed., Supp. III), as authorization for these actions. Section 1702 (a)(1) provides in part:

> "At the times and to the extent specified in section 1701 of this title, the President may, under such regu-

lations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) investigate, regulate, or prohibit—

"(i) any transactions in foreign exchange,

"(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

"(iii) the importing or exporting of currency or securities, and

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

"by any person, or with respect to any property, subject to the jurisdiction of the United States."

The Government contends that the acts of "nullifying" the attachments and ordering the "transfer" of the frozen assets are specifically authorized by the plain language of the above statute. The two Courts of Appeals that have considered the issue agreed with this contention. In *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water & Power Authority*, the Court of Appeals for the First Circuit explained:

"The President relied on his IEEPA powers in November 1979, when he 'blocked' all Iranian assets in this country, and again in January 1981, when he 'nullified' interests acquired in blocked property, and ordered that property's transfer. The President's actions, in this regard, are in keeping with the language of IEEPA: initially he 'prevent[ed] and prohibit[ed]' 'transfers' of Iranian assets; later he 'direct[ed] and compel[led]' the

'transfer' and 'withdrawal' of the assets, 'nullify[ing]' certain 'rights' and 'privileges' acquired in them.

"Main argues that IEEPA does not supply the President with power to override judicial remedies, such as attachments and injunctions, or to extinguish 'interests' in foreign assets held by United States citizens. But we can find no such limitation in IEEPA's terms. The language of IEEPA is sweeping and unqualified. It provides broadly that the President may void or nullify the 'exercising [by *any* person of] *any* right, power or privilege with respect to . . . any property in which any foreign country has any interest . . . .' 50 U. S. C. § 1702 (a)(1)(B)." 651 F. 2d, at 806–807 (emphasis in original).

In *American Int'l Group, Inc.* v. *Islamic Republic of Iran,* the Court of Appeals for the District of Columbia Circuit employed a similar rationale in sustaining President Carter's action:

"The Presidential revocation of the license he issued permitting prejudgment restraints upon Iranian assets is an action that falls within the plain language of the IEEPA. In vacating the attachments, he acted to 'nullify [and] void . . . any . . . exercising any right, power, or privilege with respect to . . . any property in which any foreign country . . . has any interest . . . by any person . . . subject to the jurisdiction of the United States.' " 211 U. S. App. D. C., at 477, 657 F. 2d, at 439 (footnote omitted).

Petitioner contends that we should ignore the plain language of this statute because an examination of its legislative history as well as the history of § 5 (b) of the Trading With the Enemy Act (hereinafter TWEA), 40 Stat. 411, as amended, 50 U. S. C. App. § 5 (b) (1976 ed. and Supp. III), from which the pertinent language of § 1702 is directly drawn,

reveals that the statute was not intended to give the President such extensive power over the assets of a foreign state during times of national emergency. According to petitioner, once the President instituted the November 14, 1979, blocking order, § 1702 authorized him "only to continue the freeze or to discontinue controls." Brief for Petitioner 32.

We do not agree and refuse to read out of § 1702 all meaning to the words "transfer," "compel," or "nullify." Nothing in the legislative history of either § 1702 or § 5 (b) of the TWEA requires such a result. To the contrary, we think both the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power. See, *e. g., Orvis* v. *Brownell,* 345 U. S. 183 (1953).[5] Although Congress in-

---

[5] Petitioner argues that under the TWEA the President was given two powers: (1) the power temporarily to freeze or block the transfer of foreign-owned assets; and (2) the power summarily to seize and permanently vest title to foreign-owned assets. It is contended that only the "vesting" provisions of the TWEA gave the President the power *permanently* to dispose of assets and when Congress enacted the IEEPA in 1977 it purposefully did not grant the President this power. According to petitioner, the nullification of the attachments and the transfer of the assets will permanently dispose of the assets and would not even be permissible under the TWEA. We disagree. Although it is true the IEEPA does not give the President the power to "vest" or to take title to the assets, it does not follow that the President is not authorized under both the IEEPA and the TWEA to otherwise permanently dispose of the assets in the manner done here. Petitioner errs in assuming that the only power granted by the language used in both § 1702 and § 5(b) of the TWEA is the power temporarily to freeze assets. As noted above, the plain language of the statute defies such a holding. Section 1702 authorizes the President to "direct and compel" the "transfer, withdrawal, transportation, . . . or exportation of . . . any property in which any foreign country . . . has any interest . . . ."

We likewise reject the contention that *Orvis* v. *Brownell* and *Zittman* v. *McGrath,* 341 U. S. 446 (1951), grant petitioner the right to retain its attachments on the Iranian assets. To the contrary, we think *Orvis* supports the proposition that an American claimant may not use an attach-

tended to limit the President's emergency power in peacetime, we do not think the changes brought about by the enactment of the IEEPA in any way affected the authority of the President to take the specific actions taken here. We likewise note that by the time petitioner instituted this action, the President had already entered the freeze order. Petitioner proceeded against the blocked assets only after the Treasury Department had issued revocable licenses authorizing such proceedings and attachments. The Treasury Regulations provided that "unless licensed" any attachment is null and void, 31 CFR § 535.203 (e) (1980), and all licenses "may be amended, modified, or revoked at any time." § 535.805. As such, the attachments obtained by petitioner were specifically made subordinate to further actions which the President might take under the IEEPA. Petitioner was on notice of the contingent nature of its interest in the frozen assets.

This Court has previously recognized that the congressional purpose in authorizing blocking orders is "to put control of foreign assets in the hands of the President . . . ." *Propper* v. *Clark,* 337 U. S. 472, 493 (1949). Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency. The frozen assets serve as a "bargaining chip" to be used by the President when dealing with a hostile country. Accordingly, it is difficult to accept petitioner's argument because the practical effect of it is to allow individual claimants throughout the country to minimize or wholly eliminate this "bargaining chip" through attachments, garnishments, or similar encumbrances on property. Neither the purpose the

---

ment that is subject to a revocable license and that has been obtained after the entry of a freeze order to limit in any way the actions the *President* may take under § 1702 respecting the frozen assets. An attachment so obtained is in every sense subordinate to the President's power under the IEEPA.

statute was enacted to serve nor its plain language supports such a result.[6]

Because the President's action in nullifying the attachments and ordering the transfer of the assets was taken pursuant to specific congressional authorization, it is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown,* 343 U. S., at 637 (Jackson, J., concurring). Under the circumstances of this case, we cannot say that petitioner has sustained that heavy burden. A contrary ruling would mean that the Federal Government as a whole lacked the power exercised by the President, see *id.,* at 636–637, and that we are not prepared to say.

---

[6] Although petitioner concedes that the President could have forbidden attachments, it nevertheless argues that once he allowed them the President permitted claimants to acquire property interests in their attachments. Petitioner further argues that only the licenses to obtain the attachments were made revocable, not the attachments themselves. It is urged that the January 19, 1981, order revoking all licenses only affected petitioner's right to obtain future attachments. We disagree. As noted above, the regulations specifically provided that any attachment is null and void "unless licensed," and all licenses may be revoked at any time. Moreover, common sense defies petitioner's reading of the regulations. The President could hardly have intended petitioner and other similarly situated claimants to have the power to take control of the frozen assets out of his hands.

Our construction of petitioner's attachments as being "revocable," "contingent," and "in every sense subordinate to the President's power under the IEEPA," in effect answers petitioner's claim that even if the President had the authority to nullify the attachments and transfer the assets, the exercise of such would constitute an unconstitutional taking of property in violation of the Fifth Amendment absent just compensation. We conclude that because of the President's authority to prevent or condition attachments, and because of the orders he issued to this effect, petitioner did not acquire any "property" interest in its attachments of the sort that would support a constitutional claim for compensation.

## IV

Although we have concluded that the IEEPA constitutes specific congressional authorization to the President to nullify the attachments and order the transfer of Iranian assets, there remains the question of the President's authority to suspend claims pending in American courts. Such claims have, of course, an existence apart from the attachments which accompanied them. In terminating these claims through Executive Order No. 12294, the President purported to act under authority of both the IEEPA and 22 U. S. C. § 1732, the so-called "Hostage Act." [7]  46 Fed. Reg. 14111 (1981).

We conclude that although the IEEPA authorized the nullification of the attachments, it cannot be read to authorize the suspension of the claims. The claims of American citizens against Iran are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property. An *in personam* lawsuit, although it might eventually be reduced to judgment and that judgment might be executed upon, is an effort to establish liability and fix damages and does not focus on any particular property within the jurisdiction. The terms of the IEEPA therefore do not authorize the President to suspend claims in American courts. This is the view of all the courts which have considered the question. *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water & Power Authority,* 651 F. 2d, at 809–814; *American Int'l Group, Inc.* v. *Islamic Republic of Iran,* 211 U. S. App. D. C., at 481, n. 15, 657 F. 2d, at 443, n. 15; *The Marschalk Co.* v. *Iran National Airlines Corp.,* 518 F. Supp. 69, 79 (SDNY

---

[7] Judge Mikva, in his separate opinion in *American Int'l Group, Inc.* v. *Islamic Republic of Iran,* 211 U. S. App. D. C. 468, 490, 657 F. 2d 430, 452 (1981), argued that the moniker "Hostage Act" was newly coined for purposes of this litigation. Suffice it to say that we focus on the language of 22 U. S. C. § 1732, not any shorthand description of it. See W. Shakespeare, Romeo and Juliet, Act II, scene 2, line 43 ("What's in a name?").

1981); *Electronic Data Systems Corp.* v. *Social Security Organization of Iran,* 508 F. Supp. 1350, 1361 (ND Tex. 1981). The Hostage Act, passed in 1868, provides:

> "Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress." Rev. Stat. § 2001, 22 U. S. C. § 1732.

We are reluctant to conclude that this provision constitutes specific authorization to the President to suspend claims in American courts. Although the broad language of the Hostage Act suggests it may cover this case, there are several difficulties with such a view. The legislative history indicates that the Act was passed in response to a situation unlike the recent Iranian crisis. Congress in 1868 was concerned with the activity of certain countries refusing to recognize the citizenship of naturalized Americans traveling abroad, and repatriating such citizens against their will. See, *e. g.,* Cong. Globe, 40th Cong., 2d Sess., 4331 (1868) (Sen. Fessenden); *id.,* at 4354 (Sen. Conness); see also 22 U. S. C. § 1731. These countries were not interested in returning the citizens in exchange for any sort of ransom. This also explains the reference in the Act to imprisonment "in violation of the rights of American citizenship." Although the Iranian hostage-taking violated international law and common decency,

the hostages were not seized out of any refusal to recognize their American citizenship—they were seized precisely *because of* their American citizenship. The legislative history is also somewhat ambiguous on the question whether Congress contemplated Presidential action such as that involved here or rather simply reprisals directed against the offending foreign country and *its* citizens. See, *e. g.,* Cong. Globe, 40th Cong., 2d Sess., 4205 (1868); *American Int'l Group, Inc.* v. *Islamic Republic of Iran, supra,* at 490–491, 657 F. 2d, at 452–453 (opinion of Mikva, J.).

Concluding that neither the IEEPA nor the Hostage Act constitutes specific authorization of the President's action suspending claims, however, is not to say that these statutory provisions are entirely irrelevant to the question of the validity of the President's action. We think both statutes highly relevant in the looser sense of indicating congressional acceptance of a broad scope for executive action in circumstances such as those presented in this case. As noted in Part III, *supra,* at 670–672, the IEEPA delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country. The Hostage Act similarly indicates congressional willingness that the President have broad discretion when responding to the hostile acts of foreign sovereigns. As Senator Williams, draftsman of the language eventually enacted as the Hostage Act, put it:

> "If you propose any remedy at all, you must invest the Executive with some discretion, so that he may apply the remedy to a case as it may arise. As to England or France he might adopt one policy to relieve a citizen imprisoned by either one of those countries; as to the Barbary powers, he might adopt another policy; as to the islands of the ocean, another. With different countries that have different systems of government he might adopt different means." Cong. Globe, 40th Cong., 2d Sess., 4359 (1868).

Proponents of the bill recognized that it placed a "loose discretion" in the President's hands, *id.*, at 4238 (Sen. Stewart), but argued that "[s]omething must be intrusted to the Executive" and that "[t]he President ought to have the power to do what the exigencies of the case require to rescue [a] citizen from imprisonment." *Id.*, at 4233, 4357 (Sen. Williams). An original version of the Act, which authorized the President to suspend trade with a foreign country and even arrest citizens of that country in the United States in retaliation, was rejected because "there may be a great variety of cases arising where other and different means would be equally effective, and where the end desired could be accomplished without resorting to such dangerous and violent measures." *Id.*, at 4233 (Sen. Williams).

Although we have declined to conclude that the IEEPA or the Hostage Act directly authorizes the President's suspension of claims for the reasons noted, we cannot ignore the general tenor of Congress' legislation in this area in trying to determine whether the President is acting alone or at least with the acceptance of Congress. As we have noted, Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act. Such failure of Congress specifically to delegate authority does not, "especially . . . in the areas of foreign policy and national security," imply "congressional disapproval" of action taken by the Executive. *Haig* v. *Agee, ante,* at 291. On the contrary, the enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to "invite" "measures on independent presidential responsibility," *Youngstown,* 343 U. S., at 637 (Jackson, J., concurring). At least this is so where there is no contrary indication of legislative intent and when, as here, there is a history of congressional acquiescence in conduct of the sort

engaged in by the President. It is to that history which we now turn.

Not infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are "sources of friction" between the two sovereigns. *United States* v. *Pink*, 315 U. S. 203, 225 (1942). To resolve these difficulties, nations have often entered into agreements settling the claims of their respective nationals. As one treatise writer puts it, international agreements settling claims by nationals of one state against the government of another "are established international practice reflecting traditional international theory." L. Henkin, Foreign Affairs and the Constitution 262 (1972). Consistent with that principle, the United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries. Though those settlements have sometimes been made by treaty, there has also been a longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate.[8] Under such agreements, the President has agreed to renounce or extinguish claims of United States nationals against foreign governments in return for lump-sum payments or the establishment of arbitration procedures. To be sure, many of these settlements were encouraged by the United States claimants themselves, since a claimant's only hope of obtaining any payment at all might lie in having his Government negotiate a diplomatic settlement on his behalf. But it is also undisputed

---

[8] At least since the case of the "Wilmington Packet" in 1799, Presidents have exercised the power to settle claims of United States nationals by executive agreement. See Lillich, The Gravel Amendment to the Trade Reform Act of 1974, 69 Am. J. Int'l L. 837, 844 (1975). In fact, during the period of 1817–1917, "no fewer than eighty executive agreements were entered into by the United States looking toward the liquidation of claims of its citizens." W. McClure, International Executive Agreements 53 (1941). See also 14 M. Whiteman, Digest of International Law 247 (1970).

that the "United States has sometimes disposed of the claims of its citizens without their consent, or even without consultation with them, usually without exclusive regard for their interests, as distinguished from those of the nation as a whole." Henkin, *supra,* at 262–263.   Accord, Restatement (Second) of Foreign Relations Law of the United States § 213 (1965) (President "may waive or settle a claim against a foreign state . . . [even] without the consent of the [injured] national").   It is clear that the practice of settling claims continues today.   Since 1952, the President has entered into at least 10 binding settlements with foreign nations, including an $80 million settlement with the People's Republic of China.[9]

Crucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement.   This is best demonstrated by Congress' enactment of the International Claims Settlement Act of 1949, 64 Stat. 13, as amended, 22 U. S. C. § 1621 *et seq.* (1976 ed. and Supp. IV).   The Act had two purposes: (1) to allocate to United States nationals funds received in the course of an executive claims settlement with Yugoslavia, and (2) to provide a procedure whereby funds resulting from future settlements could be distributed.   To achieve these ends Congress created the International Claims Commission, now the Foreign Claims Settlement Commission, and gave it jurisdiction to make final and binding decisions with respect to claims by United States nationals against settlement funds. 22 U. S. C. § 1623 (a).   By creating a procedure to implement future settlement agreements, Congress placed its stamp of approval on such agreements.   Indeed, the legislative history of the Act observed that the United States was seeking settle-

---

[9] Those agreements are [1979] 30 U. S. T. 1957 (People's Republic of China); [1976] 27 U. S. T. 3933 (Peru); [1976] 27 U. S. T. 4214 (Egypt); [1974] 25 U. S. T. 227 (Peru); [1973] 24 U. S. T. 522 (Hungary); [1969] 20 U. S. T. 2654 (Japan); [1965] 16 U. S. T. 1 (Yugoslavia); [1963] 14 U. S. T. 969 (Bulgaria); [1960] 11 U. S. T. 1953 (Poland); [1960] 11 U. S. T. 317 (Rumania).

ments with countries other than Yugoslavia and that the bill contemplated settlements of a similar nature in the future. H. R. Rep. No. 770, 81st Cong., 1st Sess., 4, 8 (1949).

Over the years Congress has frequently amended the International Claims Settlement Act to provide for particular problems arising out of settlement agreements, thus demonstrating Congress' continuing acceptance of the President's claim settlement authority. With respect to the Executive Agreement with the People's Republic of China, for example, Congress established an allocation formula for distribution of the funds received pursuant to the Agreement. 22 U. S. C. § 1627 (f) (1976 ed., Supp. IV). As with legislation involving other executive agreements, Congress did not question the fact of the settlement or the power of the President to have concluded it. In 1976, Congress authorized the Foreign Claims Settlement Commission to adjudicate the merits of claims by United States nationals against East Germany, prior to any settlement with East Germany, so that the Executive would "be in a better position to negotiate an adequate settlement . . . of these claims." S. Rep. No. 94–1188, p. 2 (1976); 22 U. S. C. § 1644b. Similarly, Congress recently amended the International Claims Settlement Act to facilitate the settlement of claims against Vietnam. 22 U. S. C. §§ 1645, 1645a (5) (1976 ed., Supp. IV). The House Report stated that the purpose of the legislation was to establish an official inventory of losses of private United States property in Vietnam so that recovery could be achieved "through future direct Government-to-Government negotiation of private property claims." H. R. Rep. No. 96–915, pp. 2–3 (1980). Finally, the legislative history of the IEEPA further reveals that Congress has accepted the authority of the Executive to enter into settlement agreements. Though the IEEPA was enacted to provide for some limitation on the President's emergency powers, Congress stressed that "[n]othing in this act is intended . . . to interfere with the authority

of the President to [block assets], or to impede the settlement of claims of U. S. citizens against foreign countries." S. Rep. No. 95–466, p. 6 (1977); 50 U. S. C. § 1706 (a)(1) (1976 ed., Supp. III).[10]

In addition to congressional acquiescence in the President's power to settle claims, prior cases of this Court have also recognized that the President does have some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate. In *United States* v. *Pink,* 315 U. S. 203 (1942), for example, the Court upheld the validity of the Litvinov Assignment, which was part of an Executive Agreement whereby the Soviet Union assigned to the United States amounts owed to it by American nationals so that outstanding claims of other American nationals could

---

[10] Indeed, Congress has consistently failed to object to this longstanding practice of claim settlement by executive agreement, even when it has had an opportunity to do so. In 1972, Congress entertained legislation relating to congressional oversight of such agreements. But Congress took only limited action, requiring that the text of significant executive agreements be transmitted to Congress. 1 U. S. C. § 112b. In *Haig* v. *Agee, ante,* p. 280, we noted that "[d]espite the longstanding and officially promulgated view that the Executive has the power to withhold passports for reasons of national security and foreign policy, Congress in 1978, 'though it once again enacted legislation relating to passports, left completely untouched the broad rule-making authority granted in the earlier Act.'" *Ante,* at 301, quoting *Zemel* v. *Rusk,* 381 U. S. 1, 12 (1965). Likewise in this case, Congress, though legislating in the area, has left "untouched" the authority of the President to enter into settlement agreements.

The legislative history of 1 U. S. C. § 112b further reveals that Congress has accepted the President's authority to settle claims. During the hearings on the bill, Senator Case, the sponsor of the Act, stated with respect to executive claim settlements:

"I think it is a most interesting [area] in which we have accepted the right of the President, one individual, acting through his diplomatic force, to adjudicate and settle claims of American nationals against foreign countries. But that is a fact." Transmittal of Executive Agreements to Congress: Hearings on S. 596 before the Senate Committee on Foreign Relations, 92d Cong., 1st Sess., 74 (1971).

be paid. The Court explained that the resolution of such claims was integrally connected with normalizing United States' relations with a foreign state:

"Power to remove such obstacles to full recognition as settlement of claims of our nationals . . . certainly is a modest implied power of the President . . . . No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities . . . is to be drastically revised." *Id.,* at 229–230.

Similarly, Judge Learned Hand recognized:

"The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government; and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations." *Ozanic* v. *United States,* 188 F. 2d 228, 231 (CA2 1951).

Petitioner raises two arguments in opposition to the proposition that Congress has acquiesced in this longstanding practice of claims settlement by executive agreement. First, it suggests that all pre-1952 settlement claims, and corresponding court cases such as *Pink,* should be discounted because of the evolution of the doctrine of sovereign immunity. Petitioner observes that prior to 1952 the United States adhered to the doctrine of absolute sovereign immunity, so that absent action by the Executive there simply would be no remedy for a United States national against a foreign government. When the United States in 1952 adopted a more restrictive

notion of sovereign immunity, by means of the so-called "Tate" letter, it is petitioner's view that United States nationals no longer needed executive aid to settle claims and that, as a result, the President's authority to settle such claims in some sense "disappeared." Though petitioner's argument is not wholly without merit, it is refuted by the fact that since 1952 there have been at least 10 claims settlements by executive agreement. Thus, even if the pre-1952 cases should be disregarded, congressional acquiescence in settlement agreements since that time supports the President's power to act here.

Petitioner next asserts that Congress divested the President of the authority to settle claims when it enacted the Foreign Sovereign Immunities Act of 1976 (hereinafter FSIA), 28 U. S. C. §§ 1330, 1602 *et seq.* The FSIA granted personal and subject-matter jurisdiction in the federal district courts over commercial suits brought by claimants against those foreign states which have waived immunity. 28 U. S. C. § 1330. Prior to the enactment of the FSIA, a foreign government's immunity to suit was determined by the Executive Branch on a case-by-case basis. According to petitioner, the principal purpose of the FSIA was to depoliticize these commercial lawsuits by taking them out of the arena of foreign affairs—where the Executive Branch is subject to the pressures of foreign states seeking to avoid liability through a grant of immunity—and by placing them within the exclusive jurisdiction of the courts. Petitioner thus insists that the President, by suspending its claims, has circumscribed the jurisdiction of the United States courts in violation of Art. III of the Constitution.

We disagree. In the first place, we do not believe that the President has attempted to divest the federal courts of jurisdiction. Executive Order No. 12294 purports only to "suspend" the claims, not divest the federal court of "jurisdiction." As we read the Executive Order, those claims not within the jurisdiction of the Claims Tribunal will "revive"

and become judicially enforceable in United States courts. This case, in short, illustrates the difference between modifying federal-court jurisdiction and directing the courts to apply a different rule of law. See *United States* v. *Schooner Peggy,* 1 Cranch 103 (1801). The President has exercised the power, acquiesced in by Congress, to settle claims and, as such, has simply effected a change in the substantive law governing the lawsuit. Indeed, the very example of sovereign immunity belies petitioner's argument. No one would suggest that a determination of sovereign immunity divests the federal courts of "jurisdiction." Yet, petitioner's argument, if accepted, would have required courts prior to the enactment of the FSIA to reject as an encroachment on their jurisdiction the President's determination of a foreign state's sovereign immunity.

Petitioner also reads the FSIA much too broadly. The principal purpose of the FSIA was to codify contemporary concepts concerning the scope of sovereign immunity and withdraw from the President the authority to make binding determinations of the sovereign immunity to be accorded foreign states. See *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water & Power Authority,* 651 F. 2d, at 813–814; *American Int'l Group, Inc.* v. *Islamic Republic of Iran,* 211 U. S. App. D. C., at 482, 657 F. 2d, at 444. The FSIA was thus designed to remove one particular barrier to suit, namely sovereign immunity, and cannot be fairly read as *prohibiting* the President from settling claims of United States nationals against foreign governments. It is telling that the 'Congress which enacted the FSIA considered but rejected several proposals designed to limit the power of the President to enter into executive agreements, including claims settlement agreements.[11]

---

[11] The rejected legislation would typically have required congressional approval of executive agreements before they would be considered effective. See Congressional Oversight of Executive Agreements: Hearings on S. 632 and S. 1251 before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 243–261,

It is quite unlikely that the same Congress that rejected proposals to limit the President's authority to conclude executive agreements sought to accomplish that very purpose *sub silentio* through the FSIA. And, as noted above, just one year after enacting the FSIA, Congress enacted the IEEPA, where the legislative history stressed that nothing in the IEEPA was to impede the settlement of claims of United States citizens. It would be surprising for Congress to express this support for settlement agreements had it intended the FSIA to eliminate the President's authority to make such agreements.

In light of all of the foregoing—the inferences to be drawn from the character of the legislation Congress has enacted in the area, such as the IEEPA and the Hostage Act, and from the history of acquiescence in executive claims settlement—we conclude that the President was authorized to suspend pending claims pursuant to Executive Order No. 12294. As Justice Frankfurter pointed out in *Youngstown,* 343 U. S., at 610–611, "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II." Past practice does not, by itself, create power, but "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent . . . ." *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 474 (1915). See *Haig* v. *Agee, ante,* at 291–292. Such practice is present here and such a presumption is also appropriate. In light of the fact that Congress may be considered to have consented to the President's action in suspending claims, we cannot say that action exceeded the President's powers.

Our conclusion is buttressed by the fact that the means

302–311 (1975); Congressional Review of International Agreements: Hearings before the Subcommittee on International Security and Scientific Affairs of the House Committee on International Relations, 94th Cong., 2d Sess., 167, 246 (1976).

chosen by the President to settle the claims of American nationals provided an alternative forum, the Claims Tribunal, which is capable of providing meaningful relief. The Solicitor General also suggests that the provision of the Claims Tribunal will actually *enhance* the opportunity for claimants to recover their claims, in that the Agreement removes a number of jurisdictional and procedural impediments faced by claimants in United States courts. Brief for Federal Respondents 13–14. Although being overly sanguine about the chances of United States claimants before the Claims Tribunal would require a degree of naiveté which should not be demanded even of judges, the Solicitor General's point cannot be discounted. Moreover, it is important to remember that we have already held that the President has the *statutory* authority to nullify attachments and to transfer the assets out of the country. The President's power to do so does not depend on his provision of a forum whereby claimants can recover on those claims. The fact that the President has provided such a forum here means that the claimants are receiving something in return for the suspension of their claims, namely, access to an international tribunal before which they may well recover something on their claims. Because there does appear to be a real "settlement" here, this case is more easily analogized to the more traditional claim settlement cases of the past.

Just as importantly, Congress has not disapproved of the action taken here. Though Congress has held hearings on the Iranian Agreement itself,[12] Congress has not enacted legislation, or even passed a resolution, indicating its displeasure with the Agreement. Quite the contrary, the relevant Sen-

---

[12] See Hearings on the Iranian Agreements before the Senate Committee on Foreign Relations, 97th Cong., 1st Sess. (1981); Hearings on the Iranian Asset Settlement before the Senate Committee on Banking, Housing and Urban Affairs, 97th Cong., 1st Sess. (1981); Hearings on the Algerian Declarations before the House Committee on Foreign Affairs, 97th Cong., 1st Sess. (1981).

ate Committee has stated that the establishment of the Tribunal is "of vital importance to the United States." S. Rep. No. 97–71, p. 5 (1981).[13] We are thus clearly not confronted with a situation in which Congress has in some way resisted the exercise of Presidential authority.

Finally, we re-emphasize the narrowness of our decision. We do not decide that the President possesses plenary power to settle claims, even as against foreign governmental entities. As the Court of Appeals for the First Circuit stressed, "[t]he sheer magnitude of such a power, considered against the background of the diversity and complexity of modern international trade, cautions against any broader construction of authority than is necessary." *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water & Power Authority,* 651 F. 2d, at 814. But where, as here, the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between our country and another, and where, as here, we can conclude that Congress acquiesced in the President's action, we are not prepared to say that the President lacks the power to settle such claims.

V

We do not think it appropriate at the present time to address petitioner's contention that the suspension of claims, if authorized, would constitute a taking of property in violation of the Fifth Amendment to the United States Constitution in the absence of just compensation.[14] Both petitioner and

---

[13] Contrast congressional reaction to the Iranian Agreements with congressional reaction to a 1973 Executive Agreement with Czechoslovakia. There the President sought to settle over $105 million in claims against Czechoslovakia for $20.5 million. Congress quickly demonstrated its displeasure by enacting legislation requiring that the Agreement be renegotiated. See Lillich, *supra* n. 8, at 839–840. Though Congress has shown itself capable of objecting to executive agreements, it has rarely done so and has not done so in this case.

[14] Though we conclude that the President has settled petitioner's claims against Iran, we do not suggest that the settlement has terminated peti-

the Government concede that the question whether the suspension of the claims constitutes a taking is not ripe for review. Brief for Petitioner 34, n. 32; Brief for Federal Respondents 65. Accord, *Chas. T. Main Int'l, Inc.* v. *Khuzestan Water & Power Authority, supra,* at 814–815; *American Int'l Group, Inc.* v. *Islamic Republic of Iran,* 211 U. S. App. D. C., at 485, 657 F. 2d, at 447. However, this contention, and the possibility that the President's actions may effect a taking of petitioner's property, make ripe for adjudication the question whether petitioner will have a remedy at law in the Court of Claims under the Tucker Act, 28 U. S. C. § 1491 (1976 ed., Supp. III), in such an event. That the fact and extent of the taking in this case is yet speculative is inconsequential because "there must be at the time of taking 'reasonable, certain and adequate provision for obtaining compensation.'" *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 124–125 (1974), quoting *Cherokee Nation* v. *Southern Kansas R. Co.,* 135 U. S. 641, 659 (1890); see also *Cities Service Co.* v. *McGrath,* 342 U. S. 330, 335–336 (1952); *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 94, n. 39 (1978).

It has been contended that the "treaty exception" to the jurisdiction of the Court of Claims, 28 U. S. C. § 1502, might preclude the Court of Claims from exercising jurisdiction over any takings claim the petitioner might bring. At oral argument, however, the Government conceded that § 1502 would not act as a bar to petitioner's action in the Court of Claims. Tr. of Oral Arg. 39–42, 47. We agree. See *United States* v. *Weld,* 127 U. S. 51 (1888); *United States* v. *Old Settlers,* 148 U. S. 427 (1893); *Hughes Aircraft Co.* v. *United States,* 209 Ct. Cl. 446, 534 F. 2d 889 (1976). Accordingly, to the extent petitioner believes it has suffered an unconstitutional taking by the suspension of the claims, we see no jurisdic-

tioner's possible taking claim against the United States. We express no views on petitioner's claims that it has suffered a taking.

tional obstacle to an appropriate action in the United States Court of Claims under the Tucker Act.

The judgment of the District Court is accordingly affirmed, and the mandate shall issue forthwith.

*It is so ordered.*

JUSTICE STEVENS, concurring in part.

In my judgment the possibility that requiring this petitioner to prosecute its claim in another forum will constitute an unconstitutional "taking" is so remote that I would not address the jurisdictional question considered in Part V of the the Court's opinion. However, I join the remainder of the opinion.

JUSTICE POWELL, concurring in part and dissenting in part.

I join the Court's opinion except its decision that the nullification of the attachments did not effect a taking of property interests giving rise to claims for just compensation. *Ante,* at 674, n. 6. The nullification of attachments presents a separate question from whether the suspension and proposed settlement of claims against Iran may constitute a taking. I would leave both "taking" claims open for resolution on a case-by-case basis in actions before the Court of Claims. The facts of the hundreds of claims pending against Iran are not known to this Court and may differ from the facts in this case. I therefore dissent from the Court's decision with respect to attachments. The decision may well be erroneous,[1] and it certainly is premature with respect to many claims.

---

[1] Even though the Executive Orders purported to make attachments conditional, there is a substantial question whether the Orders themselves may have effected a taking by making conditional the attachments that claimants against Iran otherwise could have obtained without condition. Moreover, because it is settled that an attachment entitling a creditor to resort to specific property for the satisfaction of a claim is a property right compensable under the Fifth Amendment, *Armstrong* v. *United States,* 364 U. S. 40 (1960); *Louisville Bank* v. *Radford,* 295 U. S. 555

I agree with the Court's opinion with respect to the suspension and settlement of claims against Iran and its instrumentalities. The opinion makes clear that some claims may not be adjudicated by the Claims Tribunal, and that others may not be paid in full. The Court holds that parties whose valid claims are not adjudicated or not fully paid may bring a "taking" claim against the United States in the Court of Claims, the jurisdiction of which this Court acknowledges. The Government must pay just compensation when it furthers the Nation's foreign policy goals by using as "bargaining chips" claims lawfully held by a relatively few persons and subject to the jurisdiction of our courts.[2] The extraordinary powers of the President and Congress upon which our decision rests cannot, in the circumstances of this case, displace the Just Compensation Clause of the Constitution.

---

(1935), there is a question whether the revocability of the license under which petitioner obtained its attachments suffices to render revocable the attachments themselves. See *Marschalk Co.* v. *Iran . National Airlines Corp.*, 518 F. Supp. 69 (SDNY 1981).

[2] As the Court held in *Armstrong* v. *United States, supra,* at 49:

"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

The Court unanimously reaffirmed this understanding of the Just Compensation Clause in the recent case of *Agins* v. *City of Tiburon,* 447 U. S. 255, 260–261 (1980).