651 F.2d 1007
 ELECTRONIC DATA SYSTEMS CORPORATION IRAN, Plaintiff-Appellee,
v.
The SOCIAL SECURITY ORGANIZATION OF the GOVERNMENT OF IRAN,
the Ministry of Health and Welfare of the
Government of Iran, the Government of
Iran, and Itel Corp.,
Defendants-Appellants.
ELECTRONIC DATA SYSTEMS CORPORATION IRAN, Plaintiff-Appellee,
v.
SOCIAL SECURITY ORGANIZATION OF the GOVERNMENT OF IRAN, et
al., Defendants- Appellants.
ELECTRONIC DATA SYSTEMS CORP. OF IRAN, Plaintiff-Appellee,
v.
The SOCIAL SECURITY ORGANIZATION OF the GOVERNMENT OF IRAN,
the Ministry of Health and Welfare of the
Government of Iran, and the Government
of Iran, Defendants,
Donald T. Regan, the Secretary of the Treasury of the United
States of America and the United States of
America, Defendants-Appellants.
 Nos. 79-2641, 80-1641 and 81-1147.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 July 15, 1981.
Rehearing Denied August 27, 1981.
 Donald L. Case, John M. Skrhak, Dallas, Tex., for defendants-appellants in 79-2641 and 80-1641.
 Alice Daniel, Asst. Atty. Gen., Civil Div., Dept. of Justice, Washington, D. C., for amicus curiae in 79-2641.
 Judith Levin, New York City, for amicus curiae in 79-2641 and 80-1641.
 Hughes & Hill, Thomas W. Luce, III, Dallas, Tex., for plaintiff-appellee in all cases.
 John L. Hill, M. David Bryant, Dallas, Tex., for plaintiff-appellee in 79-2641.
 Steptoe & Johnson, Washington, D.C., for plaintiff-appellee in 79-2641 and 80-1641.
 Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for defendants-appellants in 80-1641.
 Robert E. Kopp, Atty., Civil Div., Dept. of Justice, Michael F. Hertz, Atty., Washington, D. C., for amicus curiae in 80-1641.
 Martha A. Mills, Ltd., Chicago, Ill., for plaintiff-appellee in 81-1147.
 Appeals from the United States District Court for the Northern District of Texas.
 Before CHARLES CLARK and RANDALL, Circuit Judges, and SHARP,* District Judge.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 In consolidated causes 79-2641 and 80-1641, the Government of Iran and other Iranian organizations ask this court to vacate the attachment of Iranian funds in a New York bank, and to reverse a judgment awarded to Electronic Data Systems Corporation (EDS). In cause 81-1147, the United States seeks the suspension of these proceedings, and asks us to vacate the district court's injunction prohibiting the government from interfering with EDS's judgment or attachment. In light of executive actions taken to bring about the release of American hostages held in Iran, and in light of Dames & Moore v. Regan, --- U.S. ----, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), we hold that all proceedings except the attachment in causes 79-2641 and 80-1641 are suspended, and that EDS must pursue its claim before the Iran-United States Claims Tribunal. The attachment, however, was accomplished prior to the 1979 freeze on Iranian assets, and the Government takes the position that it is not subject to the hostage release agreements. As a result, we hold that the injunction forbidding transfer of the attached assets shall remain in effect.
 
 I.
 
 2
 In 1976, Electronic Data Systems Corporation Iran, a subsidiary of EDS, signed a contract with "the Social Security Organization of the Government of Iran, an agency of the Ministry of Health and Social Welfare of the Government of Iran." The contract called for EDS to design and install a data processing system for the Iranian social security program. Both parties performed the contract for approximately 18 months. In June 1978, however, the Iranian parties failed to pay a monthly invoice submitted by EDS. Subsequent invoices also were ignored, and in January 1979 EDS terminated the contract.
 
 
 3
 One month later, EDS filed suit in the United States District Court for the Northern District of Texas. On June 11, 1979, the trial court entered a preliminary injunction prohibiting the transfer of some $20 million of Iranian funds in the Marine Midland Bank of New York. On May 9, 1980, after a trial on the merits, the trial court entered judgment in favor of EDS in the amount of approximately $19 million.
 
 
 4
 The Iranian defendants appealed both the attachment and the final judgment to this court in causes 79-2641 and 80-1641. Before the cases could be heard, however, the United States entered into an agreement with Iran to bring about the release of American hostages held by Iranians. The agreement took the form of two declarations by the government of Algeria. See Declaration of the Government of the Democratic and Popular Republic of Algeria (hereinafter cited as First Declaration), Jan. 19, 1981; Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (hereinafter cited as Claims Declaration), Jan. 19, 1981. The Declarations provided, inter alia, for an international tribunal, the Iran-United States Claims Tribunal, which would settle contract claims between American companies and the Iranian government. See Claims Declaration, art. II(1). In an effort to avoid relitigation of its claim before the Claims Tribunal, EDS filed cause 81-1147 against the United States, seeking an injunction prohibiting the Government from interfering in any way with the attached funds or the final judgment. The district court granted the injunction, and the Government appealed. All appeals in the case were consolidated.
 
 II.
 
 5
 In order to meet the nation's international obligations under the Declarations, President Reagan issued Executive Order 12294, 46 Fed.Reg. 14111 (Feb. 24, 1981). Section 1 of the executive order provides that "(a)ll claims which may be presented to the Iran-United States Claims Tribunal ... are hereby suspended." See also 31 C.F.R. § 535.222(a) (1981). The United States argues that, pending litigation of the claim before the Claims Tribunal, the executive order requires the immediate suspension of all proceedings in courts of the United States by EDS against Iran. EDS apparently concedes that the order, if valid, suspends its judgment. The company argues, however, and the district court found, that the President had neither statutory nor constitutional power to issue the order, and that the company was entitled to the full benefit of its judgment in the court below.
 
 
 6
 Our task in resolving this delicate constitutional issue has been eased considerably by the Supreme Court's recent decision in Dames & Moore v. Regan, --- U.S. ----, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). In Dames & Moore, the Court ruled that the President acted constitutionally in suspending claims against Iranian defendants. According to the Court, the President's power to suspend claims arises, not from a specific grant of congressional power, but from "the inferences to be drawn" from legislation such as the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 (Supp. II 1978), and the so-called Hostage Act, 22 U.S.C. § 1732 (1979), and from Congress' "history of acquiescence in executive claims settlement." See --- U.S. at ----, 101 S.Ct. at 2991. The Court emphasized the narrowness of its holding, but held that
 
 
 7
 where, as here, the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between our country and another, and where, as here, we can conclude that Congress acquiesced in the President's action, we are not prepared to say that the President lacks the power to settle such claims.
 
 
 8
 Id.
 
 
 9
 EDS has argued that its case presents a starker constitutional issue than the one raised in Dames & Moore. The company notes that its trial court judgment was entered on May 9, 1980, long before the Algerian Declarations were signed. By contrast, the trial court judgment in the Dames & Moore case was not entered until after signing of the Declarations. See --- U.S. ----, 101 S.Ct. 2979. EDS argues that, in its case, the President's order would have the effect of suspending a judgment, while in Dames & Moore the order merely suspended a claim in litigation.
 
 
 10
 Even if EDS is correct in its assertion that judgment in Dames & Moore had not been entered prior to the President's order,[1] there is nothing in the Supreme Court's opinion to indicate that this distinction has any significance. Dames & Moore upheld the President's power to suspend claims, not because the claims were insufficiently final or because the parties had notice that their claims might be suspended, but because the President's suspension of claims, tacitly approved by Congress, was essential to the resolution of a major international crisis. This rationale is fully applicable to EDS. Settlement of EDS's claim, like settlement of the claim in Dames & Moore, "has been determined to be a necessary incident to the resolution of a major foreign policy dispute" and "we can conclude that Congress acquiesced in the President's action." While the Court took pains to limit its holding, we can find no limitation based on the date on which judgment was entered. Moreover, the Court held that Executive Order 12294 changed the law governing claims against Iran, and that this change was to be applied in pending cases. --- U.S. ----, 101 S.Ct. at 2989. Under the Court's analysis, the change in law would be applied to cases pending on appeal as well as to cases pending in district court. See id.; cf. United States v. Schooner Peggy, 5 U.S. 1, (1 Cranch) 110, 2 L.Ed. 49 (1801). Accordingly, we hold that the President's suspension of claims has full application to EDS. Because the claims are being suspended, we do not reach any issue raised by any defendant which goes to jurisdiction, procedure, or the merits of the claim.
 
 III.
 
 11
 EDS's attachment of Iranian funds in the Marine Midland Bank was accomplished on June 11, 1979, several months before the November 14, 1979, freeze on Iranian assets. Unlike the date on which the trial court entered judgment, the date of attachment is critical. Because the Declarations are designed to "restore the financial position of Iran, insofar as possible, to that which existed prior to November 14, 1979," First Declaration, para. A, the United States takes the position that funds attached prior to the freeze need not be released. Thus, the United States does not call for the lifting of the attachment in this case.
 
 
 12
 The Iranian defendants dispute the Government's interpretation of the Declarations. In their view, the Declarations require the dissolution of all attachments, regardless of the date of entry. Moreover, the Iranian defendants argue that the issue cannot be resolved by American courts. As they point out, paragraph 17 of the First Declaration provides that "(i)f any ... dispute arises between the parties as to the interpretation or performance of any provision of this declaration, either party may submit the dispute to binding arbitration by the (Claims Tribunal)." They conclude that only the Tribunal can determine whether the EDS attachment should be nullified.
 
 
 13
 We express no view as to whether the Declarations require the nullification of the EDS attachment. It is for the United States government, not this court, to determine, in the first instance, the extent of its obligations under the Declarations. Like the provision calling for termination of claims, see supra at 1010 n.1, the nullification provision of the Declarations is not self-executing. Under paragraph B of the First Declaration, "the United States agrees ... to nullify all attachments and judgments" obtained in American judicial proceedings. Thus, the United States government must act to nullify attachments, and litigants may not seek direct enforcement of the Declaration in American courts. Cf. United States v. Postal, 589 F.2d 862, 877 (5th Cir. 1979). If Iran believes that the United States has interpreted the Declarations incorrectly, it must make its argument before the Claims Tribunal. When the Tribunal announces the proper interpretation, an effort to implement that decision in American courts will then be appropriate. See First Declaration, para. 17 ("Any decision of the tribunal ... may be enforced by the prevailing party in the courts of any nation"). Because the United States does not seek nullification of attachments accomplished prior to the freeze, we preserve the status quo by permitting EDS's attachment of Iran funds in the Marine Midland Bank to be maintained pending litigation before the Claims Tribunal. Again, we pretermit any decision on any defensive issue raised in this action.
 
 IV.
 
 14
 The injunction issued by the district court forbidding the transfer of Iranian funds in the Marine Midland Bank of New York shall remain in effect. All other proceedings are suspended under the terms of Executive Order 12294, 46 Fed.Reg. 14111 (1981).
 
 
 15
 In Causes 79-2641 and 80-1641 the injunction is AFFIRMED and the judgment is suspended.
 
 
 16
 In Cause 81-1147 the injunction is VACATED.
 
 
 
 *
 District Judge of the Northern District of Indiana, sitting by designation
 
 
 [1]
 The judgment in Dames & Moore was entered after the signing of the Algerian Declarations; however, the Declarations themselves do not suspend American claims, they merely require the United States government to do so. See First Declaration, para. B ("the United States agrees to terminate all legal proceedings in United States courts involving claims ... against Iran"). Thus, it is the date of the President's order which is relevant to determining whether judgment had been entered prior to suspension. Executive Order 12294 was issued on February 24, 1981. It is unclear from the Supreme Court's opinion whether judgment in Dames & Moore was entered before or after this date. We note, however, that the Court referred to Dames & Moore's argument "that the actions of the President ... were unconstitutional to the extent they adversely affect petitioner's final judgment." See --- U.S. ----, 101 S.Ct. at 2980 (emphasis added). Thus, the distinction suggested by EDS between its case and Dames & Moore may well be an illusion