699 F.2d 657
 BEHRING INTERNATIONAL, INC., a Texas corporation, Appellant
in Nos. 82-5127, 82-5281, and 82-5483,
v.
IMPERIAL IRANIAN AIR FORCE and Iran Aircraft Industries,
Agencies and Instrumentalities of Iran and the Imperial and
Islamic Governments of Iran, foreign states and/or their
successors, Appellants in No. 82-5467.
 Nos. 82-5127, 82-5281, 82-5467 and 82-5483.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 17, 1982.
Decided Feb. 9, 1983.
As Amended May 6, 1983.
Rehearing and Rehearing En Banc Denied May 9, 1983.
 
 Robert W. Delventhal (argued), Crummy, Del Deo, Dolan & Purcell, Newark, N.J., for Behring Intern., Inc.; Roger R. Evans, Behring Intern., Inc., Houston, Tex., of counsel.
 Christine Cook Nettesheim (argued), Thomas G. Shack, Jr., Shack & Kimball, P.C., Washington, D.C., for Islamic Republic of Iran Air Force, Iran Aircraft Industries, and the Islamic Republic of Iran; John B. Beaty, Washington, D.C., on brief.
 Before ALDISERT, SLOVITER, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This diversity case raises questions involving the applicability and constitutionality of the Algerian Declarations, an executive agreement between the United States and Iran, and of an Executive Order and regulations promulgated in response to the Iranian crisis. The action arises in connection with a freight forwarding contract entered into by Behring International, Inc. (Behring), a Texas corporation, and the Imperial Iranian Air Force (IRIAF) and Iran Aircraft Industries (IACI), instrumentalities of Iran.
 
 I.
 
 2
 In August of 1975 Behring and Iran entered into a written contract under which Behring was to provide freight forwarding services for the IRIAF and IACI. Pursuant to the agreement, Behring established facilities in Edison, New Jersey, to warehouse Iranian property. In the early weeks of 1979, the Shah of Iran was deposed and a new Islamic government installed. The new government repudiated the Behring contract, and on February 28, 1979, Behring brought suit against the IRIAF, IACI, and the Government of Iran, in the United States District Court for the District of New Jersey to recover monies due it under the forwarding contract.
 
 
 3
 Eight and a half months later, on November 7, 1979, Behring and the Iranian defendants settled out of court. The terms of the Settlement Agreement provided in relevant part:
 
 
 4
 1. I.R.I.A.F. will, within one week of the execution of this Agreement, deposit to [a] Trust Account $635,000, and the Trustee will draw a check payable to Behring for the $635,000 which I.A.C.I. has verified as being owed.
 
 
 5
 * * *
 
 
 6
 3. Behring will consent to an order of the District Court removing temporary restraints which have been placed on I.R.I.A.F. and I.A.C.I. materials by previous order of that Court which order shall incorporate the terms of this Agreement by reference so that any party hereto may on short notice, seek the assistance of the Court (including contempt proceedings) in compelling specific performance of this Agreement.
 
 
 7
 4. Concurrent with the lifting of restraints, I.R.I.A.F. will put into the Trust Account ... an additional $230,000 to secure additional claims which Behring has against I.R.I.A.F., I.A.C.I. and the Iranian Navy until all the terms of the settlement have been satisfied.
 
 
 8
 5. Behring will furnish documentation, in accordance with past practice, to support its claims for expenses and line item charges against I.R.I.A.F., I.A.C.I. and the Iranian Navy in excess of $635,000.... With respect to all such excess sums as to which there is no dispute over the adequacy of documentation, those sums shall be paid to Behring within 30 days after submission of the documentation....
 
 
 9
 6. In the event of a dispute between the parties as to the adequacy of the documentation to be provided by Behring pursuant to Section 5 above, ... that dispute shall be settled by arbitration ... and the arbitrator's decision shall be binding and final.
 
 
 10
 * * *
 
 
 11
 11. I.R.I.A.F. and I.A.C.I. will arrange ... to remove the I.R.I.A.F., I.A.C.I. and Iranian Navy (if any) materials from [Behring's] warehouse and transport them to McGuire AFB for transshipment to Iran.
 
 
 12
 * * *
 
 
 13
 16. When all of the foregoing conditions of settlement have been either fulfilled, waived or otherwise satisfied ..., I.R.I.A.F. and Behring will join in a request for a consent order directed to the district court to order such sum to be paid to Behring out of the Trust Account as is necessary to complete payments of the amounts owed by I.R.I.A.F., I.A.C.I. and the Iranian Navy to Behring, plus $1,000,000 and any additional amount remaining in the Trust Account is to be returned to I.R.I.A.F., exclusive of interest which accrues after the execution of this Agreement on all sums to which Behring is entitled pursuant to the terms hereof, which accrued interest shall be paid to Behring.
 
 
 14
 * * *
 
 
 15
 On November 9, 1979, the district court, in accordance with Article 3 of the Settlement Agreement, issued an order incorporating the terms of the Settlement Agreement. The order stated that the district court would retain jurisdiction over the subject matter of the Settlement Agreement so that either party might apply to the court for specific performance under the Agreement.
 
 
 16
 On November 14, only five days after entry of the court's order, President Carter, responding to the seizure of American diplomatic personnel in Iran, declared a national emergency and blocked the removal or transfer of all property of the government of Iran which was subject to the jurisdiction of the United States. The Secretary of the Treasury promulgated regulations designed to carry out the President's order. 31 C.F.R. Secs. 535 et seq. These regulations established a procedure under which persons wishing to withdraw funds from a blocked account might apply to the Treasury Department's Office of Foreign Assets Control (OFAC) for a special license authorizing withdrawal. 31 C.F.R. Sec. 535.801(b).
 
 
 17
 As of late December 1979, Behring had received $635,000 under the Settlement Agreement, but was unable to collect another $1,003,000 which the district court had on December 16 ordered paid out of the Trust Account, because the Trust Account was blocked by Executive Order. Behring then applied to OFAC for a transfer license. In April of 1980, OFAC issued a license authorizing transfer of $500,000. On May 7, 1980, Behring accomplished the transfer.[1]
 
 
 18
 Behring next applied to OFAC for a second license to unblock the balance of the trust account. When OFAC refused, Behring filed suit in the United States District Court for the District of New Jersey seeking a writ of mandamus and a declaratory judgment that the balance in the trust account was not subject to the regulations. The court denied Behring's request on the ground that as Iran retained an interest in the trust account, the granting or withholding of a license was within the discretion of the Treasury Secretary. Behring International, Inc. v. Miller, 504 F.Supp. 552, 557 (D.N.J.1980).
 
 
 19
 On January 19, 1981, the United States and Iran settled the hostage crisis by Executive Agreement (the "Algerian Declarations").[2] The United States agreed to the termination of all legal proceedings in United States courts involving claims of United States nationals against Iran, and to the nullification of all attachments and judgments obtained in American courts. These claims were to be resolved through binding arbitration in an Iran-United States Claims Tribunal created by the Executive Agreement. All claims, including unpaid judgments, outstanding as of January 19, 1981, the date of the Declarations, were to be submitted to the Tribunal, which would sit at the Hague, Netherlands. Iran agreed to establish a $1 billion fund to secure payment of awards made by the Tribunal. The United States in turn agreed to transfer to Iran those Iranian assets held in this country.
 
 
 20
 On February 24, 1981, President Reagan ratified the agreement entered into by President Carter, and promulgated Executive Order No. 12294 (the Executive Order) implementing the Algerian Declarations. Section I of the Executive Order provided in relevant part:
 
 
 21
 All claims which may be presented to the Iran-United States Tribunal under the terms of Article II of the Declaration of the Government of the Democratic and Popular Republic of Algeria concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, and all claims for equitable or other judicial relief in connection with such claims, are hereby suspended, except as they may be presented to the Tribunal.
 
 
 22
 Apparently, in response to these diplomatic developments, OFAC on February 26, 1981, reconsidered Behring's application for a second license, and granted the application. The second license, Treasury License 274A, authorized the transfer of $847,432.47 (the balance of the account) in accordance with the terms of the Settlement Agreement. Behring then withdrew $503,000, the full amount to which Behring was then entitled under the district court order of December 16, 1979.
 
 
 23
 Later in 1981, Behring made a motion in the district court seeking, inter alia, the remaining balance in the Trust Account to cover storage costs as well as the removal of Iran's property from Behring's Edison, New Jersey, warehouse. Behring claimed that it was entitled to these storage charges pursuant to the Settlement Agreement, there being no good faith dispute as to the amount, which would require arbitration. The district court determined that all amounts which were not in dispute had already been paid to Behring and that a dispute existed between the parties as to the proper settlement figure. Accordingly, the court held that the Algerian Declarations required Behring to present these claims, outstanding on January 19, 1981, to the Claims Tribunal. Similarly, the court held that Behring's request that Iran be ordered to remove its property from Behring's warehouse, and its claim for storage charges accruing between December 15, 1979, and January 19, 1981, were both outstanding as of January 19, 1981, and so must also be presented to the Tribunal. The court did conclude, however, that Behring's claim for storage charges accruing after January 19, 1981, had not been suspended by Executive Order 12294 and that Behring was entitled to prompt payment of these charges. The court further found that these charges could properly be paid out of the Trust Account.
 
 
 24
 On December 30, 1981, the district court entered an order implementing its decision, and certified the order for appeal pursuant to 28 U.S.C. Sec. 1292(b) and Fed.R.Civ.P. 54(b). Behring appealed from those portions of the order referring its claims to the Special Tribunal. The Iranian defendants appealed the portion of the order authorizing Behring to collect from the Trust Account storage charges accrued after January 19, 1981. These appeals were consolidated and both are now before us. As to Behring's appeal, we affirm the judgment of the district court. We dismiss the Iranian defendant's appeal which was not timely filed.
 
 II.
 
 25
 We address first Behring's appeal from that portion of the district court's decision referring it to the Special Tribunal at the Hague. Behring offers two distinct lines of argument. First, Behring contends that the provisions of the Algerian Declarations permitting Americans to seek relief from the Iranian government only before the Special Tribunal, do not apply to Behring. It offers a threefold argument. It urges (1) that its demand for payment was not a claim outstanding as of January 19, 1981; (2) that the choice of forum clause in the original contract vitiated the effect of the Declaration and Executive Order; and (3) that Behring falls within a special exception for warehousemen. Second, Behring contends that even if the provisions of the Algerian Declaration apply, they are unconstitutional and hence unenforceable and void.
 
 A.
 
 26
 Dealing first with Behring's contention that the Algerian Declarations are not applicable because Behring's demand for payment was not a claim outstanding on January 19, 1981, we see no merit in this contention. Behring first urges that it does not fall within the coverage of the Algerian Declaration and the Executive Order because its request for specific performance under the Settlement Agreement was equitable in nature, and hence not a "claim."
 
 
 27
 Ballantine's Law Dictionary defines "claim" as "[a] demand for money or property; the assertion of a demand, or the challenge of something, as a matter of right; a demand of some matter, as of right, made by one person upon another to do or to forbear to do some act or thing, as a matter of duty." Ballentine's Law Dictionary 205 (3d ed.1969). Similarly, the definition of "claim" in Black's Law Dictionary states in part: "Cause of action. Means by or through which claimant obtains possession or enjoyment of privilege or thing." Black's Law Dictionary 224 (5th ed.1979). These definitions seem sufficiently capacious to cover Behring's request for payment under the terms of the Settlement Agreement. As the Ballentine's definition suggests, the mere recognition by a district court of the validity of Behring's claim--a claim as of right--does not make Behring's demand for payment any less a claim.
 
 
 28
 Furthermore, the Executive Order itself specifically states that "claims for equitable ... relief ... are hereby suspended, except as they may be presented to the Tribunal." This language leaves no room for contention that, in the view of the parties to the Algerian Declarations, requests for specific performance in equity are not "claims."
 
 
 29
 Behring also urges that its demand for payment is not a claim covered by the Algerian Declaration because the claim has been perfected and there is no genuine dispute as to the amount owed. Even if we were to accept Behring's contention that a perfected claim no longer subject to dispute as to amount is not a "claim" within the meaning of the Algerian Declarations, we would still be compelled to hold that Behring's demand for payment remains a "claim" because disagreements continue to divide the parties. As Judge Fisher aptly observed in discussing Article 16 of the Settlement Agreement:
 
 
 30
 The settlement agreement entered into by the parties on November 7, 1979, does not state a final settlement figure. Rather, the agreement contemplates a process whereby the parties will eventually come to an agreement as to that figure. Since there has been no agreement as to several of plaintiff's claims for expenses and line item charges, a dispute between the parties currently exists. This amounts to a claim against the government of Iran that was outstanding on January 19, 1981.
 
 
 31
 Behring complains that the Iranians' objections to the documentation supporting its claims are advanced solely for the purpose of bringing the case within the scope of the Algerian Declarations. Be this as it may, the very assertion of the challenges creates a dispute which demands judicial resolution. Therefore, Behring's argument that as there is no dispute there is no claim, must fail.[3]
 
 
 32
 Behring next argues that even if its demand for payment under the terms of the Settlement Agreement were a "claim" for purposes of the Declarations, the claim was not outstanding as of January 19, 1981. The reason the claim was not outstanding on that date, Behring explains, is that all disputes relating to the demand for payment were resolved by the Settlement Agreement. The Settlement Agreement, however, only provided a mechanism for resolving future disputes. As we have already held that all disputes relating to the claim were not resolved by the Settlement Agreement, it follows that Behring's claim was indeed outstanding as of January 19, 1981.
 
 B.
 
 33
 We turn next to Behring's contention that even if its demand was a claim outstanding on January 19, 1981, the choice of laws provision in the Settlement Agreement, which authorizes Behring to apply to federal district court to compel specific performance under the agreement, effectively overrides the Declarations and Executive Order. In support of this proposition, Behring cites The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), which held that federal courts should ordinarily enforce contractual choice of forum clauses except where enforcement would be unjust.
 
 
 34
 Nothing in the Bremen case suggests that choice of forum clauses should be enforced in federal court even when an Executive Order dictates that they not be enforced. And there can be little doubt that the Algerian Declarations and the Executive Order made no exception for choice of forum clauses obliging contracting parties to litigate in federal court. The Executive Order unambiguously states: "[A]ll claims [brought by Americans against Iran] for equitable or other judicial relief in connection with such claims, are hereby suspended, except as they may be presented to the Tribunal." Executive Order No. 12294 Sec. 1. Furthermore, the Iranian Declarations carve a special exception to the general rule that Americans' claims against Iran must be brought before the Tribunal, by stating that where a contract provides that disputes are to be litigated in the Iranian courts this provision will be honored. Applying the expressio unius est exclusio alterius canon of construction, we must conclude that under the Algerian Declarations, the United States and Iran agreed not to honor choice of forum clauses except those designating the Iranian courts.
 
 C.
 
 35
 Finally, we address Behring's contention that although it might otherwise have been subject to the strictures of the Algerian Declaration and the Executive Order, it is at least partially exempted from these strictures by virtue of its status as a warehouseman. In its brief to this court, Behring complains that the district court's refusal to award storage charges accrued before January 19, 1981, was not legally justified because the Regulations implementing Executive Order No. 12294 expressly preserve liens against property owned by Iran and contemplate the continued availability of a forum in this country to adjudicate such claims. Behring cites no authority for the above assertion.
 
 
 36
 Behring's statement concerning the substance of Executive Order No. 12294 is correct insofar as the regulations implementing the Executive Order exempt persons holding liens against Iranian property from the general directive compelling holders of such property to return the property or dispose of it as the Iranian government directs. See 31 C.F.R. Secs. 525.214, 525.215, 535.333. Behring's statement concerning the Executive Order is incorrect insofar as it assumes that the Order contemplates the continued availability of a forum in this country to adjudicate claims in connection with Iranian government property held subject to liens. There is nothing in the regulations to suggest that the Executive Order contemplates anything of the sort. Nor have we any reason to believe that the United States Government would wish to afford persons holding secured claims against Iran procedural rights which persons holding unsecured claims against Iran do not enjoy. On the contrary, every element of the Executive Agreement and implementing regulations displays the Government's intent to have all claims against Iran heard before the Tribunal established for that purpose.
 
 D.
 
 37
 Our analysis is consistent with United States Supreme Court and court of appeals precedent. In Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the Supreme Court considered the question of whether a plaintiff might invoke judicial assistance to execute upon a judgment apparently entered after adoption of the Algerian Resolutions, but before issuance of the Executive Order. (See Electronic Data Systems v. Social Security Organization, 651 F.2d 1007, 1010 n. 1 (5th Cir.1981), discussing facts of Dames & Moore.) The Court, relying upon the Executive Order and Regulations, upheld the district court's decision to stay execution of the judgment. The Fifth Circuit has gone even further, holding that under the Declarations and the Executive Order, a plaintiff had no right to execute on a judgment obtained some months prior to January 19, 1981, the date of the Declarations. See Electronic Data Systems v. Social Security Organization, supra.
 
 
 38
 The facts of the instant case are all but indistinguishable from the facts of Dames & Moore and Electronic Data Systems, supra. Indeed, to the extent that any distinctions exist, they weigh against Behring. We therefore hold that Behring's request for relief falls squarely within the coverage of the Declarations and Executive Order.
 
 III.
 
 39
 Having concluded that Behring's claim falls within the coverage of the Declarations and Executive Order, we must consider the constitutionality of the Declarations and the Executive Order. Behring asserts that the Declarations and the Order are unconstitutional, both because they violate the separation of powers doctrine, and because they effect a taking without just compensation in violation of the fifth and fourteenth amendments to the United States Constitution.
 
 
 40
 Behring's separation of powers argument was laid to rest in Dames & Moore v. Regan, supra. In Dames & Moore, the Supreme Court, in a virtually unanimous opinion, held that Executive Order No. 12294 at issue in this case does not operate by depriving the federal courts of jurisdiction. The Court wrote:
 
 
 41
 Petitioner ... insists that the President, by suspending its claims, has circumscribed the jurisdiction of the United States courts in violation of Art. III of the Constitution.
 
 
 42
 We disagree. In the first place, we do not believe that the President has attempted to divest the federal courts of jurisdiction. Executive Order No. 12294 purports only to "suspend" the claims, not divest the federal court of "jurisdiction." As we read the Executive Order, those claims not within the jurisdiction of the Claims Tribunal will "revive" and become judicially enforceable in United States courts. This case, in short, illustrates the difference between modifying federal-court jurisdiction and directing the courts to apply a different rule of law. See United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801). The President has exercised the power, acquiesced in by Congress, to settle claims and, as such, has simply effected a change in the substantive law governing the lawsuit.
 
 453 U.S. at 684-85, 101 S.Ct. at 2989-90.[4]
 
 43
 Having found that the Executive Order did not contract the jurisdiction of the federal courts, the Supreme Court concluded that the Order did not violate the separation of powers doctrine. Noting that the Executive has customarily taken responsibility for settling claims of American nationals against foreign governments, that Congress has long acquiesced to this custom, and that Congress had acquiesced in the instant settlement, the Court held that the Executive Order giving effect to the Algerian Declarations did not pose an insurmountable separation of powers problem:
 
 
 44
 In light of all of the foregoing--the inferences to be drawn from the character of the legislation Congress has enacted in the area, such as the IEEPA and the Hostage Act, and from the history of acquiescence in executive claims settlement--we conclude that the President was authorized to suspend pending claims pursuant to Executive Order No. 12294. As Justice Frankfurter pointed out in Youngstown [Sheet & Tube Co. v. Sawyer,] 343 U.S. at 610-611 [72 S.Ct. 863, 897-96 L.Ed. 1153] "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned ... may be treated as a gloss on 'Executive Power' vested in the President by Sec. 1 of Art. II." Past practice does not, by itself, create power, but "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent...." United States v. Midwest Oil Co., 236 U.S. 459, 474 [35 S.Ct. 309, 313, 59 L.Ed. 673] (1915). See Haig v. Agee, ante [453 U.S. 280] at 291-292 [101 S.Ct. 2766 at 2774-2775, 69 L.Ed.2d 640]. Such practice is present here and such a presumption is also appropriate. In light of the fact that Congress may be considered to have consented to the President's action in suspending claims, we cannot say that action exceeded the President's powers.
 
 
 45
 453 U.S. at 686, 101 S.Ct. at 2990.
 
 
 46
 As for Behring's fifth amendment takings argument, we defer expressing any opinion on the merits of that contention until such time as it is ripe for adjudication. In Dames & Moore, supra, where plaintiff had already obtained a judgment against an Iranian agency at the time that it appeared before the Supreme Court, the Court nevertheless deferred the takings issue as unripe. The Court noted:
 
 
 47
 We do not think it appropriate at the present time to address petitioner's contention that the suspension of claims, if authorized, would constitute a taking of property in violation of the Fifth Amendment to the United States Constitution in the absence of just compensation. Both petitioner and the government concede that the question whether the suspension of the claims constitutes a taking is not ripe for review.
 
 453 U.S. at 688-89, 101 S.Ct. at 2991-92.[5]
 
 48
 The takings claim in the instant case is, if anything, even less ripe than the takings claim in Dames & Moore. In Dames & Moore, plaintiff had obtained judgment for a sum certain prior to January 19, 1981. In the instant case, by contrast, the claim has not been reduced to judgment. A fortiori, Behring's takings claims is not yet ripe for review.
 
 IV.
 
 49
 We turn now to the Iranian defendants' appeal. Defendants contend that the district court should not have authorized Behring to draw on the Trust Account to satisfy its claim for storage charges accruing after January 19, 1981, but should instead have ordered the residue of the account returned to Iran. We conclude that we are without jurisdiction to hear defendants' appeal and so do not reach its merits.
 
 
 50
 On January 11, 1982, Behring filed a motion in the district court for reargument pursuant to Fed.R.Civ.P. 59. Then, on January 29, 1982, while Behring's Rule 59 motion was still pending, defendants filed their notice of appeal. This notice of appeal was premature. Under Fed.R.App.P. 4(a)(4), a notice of appeal may not be filed while a Rule 59 motion is pending; an appeal filed prematurely under these circumstances may be given no effect. As the United States Supreme Court recently observed in Griggs v. Provident Consumer Discount Co., --- U.S. ----, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982), a contrary result would be impossible because it would permit the district court and court of appeals to exercise jurisdiction simultaneously in the same case.
 
 
 51
 By applying the Supreme Court's Griggs holding retroactively in the instant case, we honor a hallowed rule first laid down by Chief Justice Marshall in United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801). In Schooner Peggy, Chief Justice Marshall wrote:
 
 
 52
 It is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.
 
 
 53
 Id. at 110, 2 L.Ed. 49.
 
 
 54
 The Supreme Court continues to follow the rule laid down in Schooner Peggy today. The 1973 Supreme Court case of Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 citing Schooner Peggy and Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), holds that on direct appeal an appellate court must "apply the law in effect at the time that it renders its decision, unless so doing would result in manifest injustice." 416 U.S. at 711-712, 94 S.Ct. at 2016. This is true regardless of whether the change in the law is judicial, legislative, or administrative in origin. 416 U.S. at 715, 94 S.Ct. at 2018. Similarly, the 1981 Supreme Court case of Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784, citing Schooner Peggy, Thorpe, and Bradley, supra, reiterates that an appellate court hearing a case on direct review must apply the law in effect at the time of its decision, except perhaps where this would result in manifest injustice. Id. at 486 n. 16, 101 S.Ct. at 2879 n. 16.
 
 
 55
 Following the principles established in the above line of cases, we conclude that retroactive application of the Griggs holding will not result in manifest injustice and that the general rule enunciated in Schooner Peggy must be applied. The plain language of Fed.R.App.P. 4(a)(4) placed defendants on notice that an appeal filed while a Rule 59 motion was pending would be given "no effect." Although certain of this circuit's decisions preceding the Supreme Court's holding in Griggs did grant relief from the strictures of Fed.R.App.P. 4(a)(4) in cases of hardship, the substantive law embodied in Fed.R.App.P. 4(a)(4) has not changed. To the extent that the granting of relief from the strictures of Fed.R.App.P. 4(a)(4) has always been a matter of grace, we cannot say that the refusal to extend grace in this case is manifest injustice.[6] We must therefore dismiss defendants' appeal.
 
 V.
 
 56
 In conclusion, we hold that the district court properly declined to hear Behring's claims for expenses accruing prior to January 19, 1981. The district court was barred from considering these claims not by a withdrawal of jurisdiction as the court's memorandum suggested, but by a change in substantive law.[7] This bar does not violate the separation of powers doctrine. As for Behring's fifth amendment takings claim, we hold that claim not yet ripe for adjudication. We do not rule on defendants' appeal as it was not timely filed, and we are without jurisdiction to consider its merits.
 
 
 57
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 For reasons not apparent to this court, the amount of money in the Trust Account has exceeded the amount which the Iranian defendants were required to pay into the account under the terms of the Settlement Agreement
 
 
 [2]
 The two Algerian Declarations are the Declaration of the Government of the Democratic and Popular Republic of Algeria, 20 Int'l L. Materials 224 (1981) (the "General Declaration") and the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and Government of the Islamic Republic of Iran, 20 Int'l L. Materials 230 (1981) (the "Claims Declaration")
 
 
 [3]
 Behring also argues that even if the Iranians had any genuine objections to its documentation, we should refuse to hear these objections because the Iranians did not object for two years after the documentation was submitted. In view of the extraordinary nature of intervening events, and the intervening suspension of litigation involving frozen Iranian assets, we do not consider Iran's objections so tardy that we must deem them waived
 
 
 [4]
 Insofar as the district court stated that it lacked jurisdiction to grant certain relief in this case, it misspoke. The district court might properly have stated that applying the substantive law established by Executive Order 12294, it could not grant some of the relief requested
 
 
 [5]
 The rationale apparently underlying the Supreme Court's holding was enunciated in greater detail by the District of Columbia Circuit the previous year. In American Intern Group v. Islamic Republic of Iran, 657 F.2d 430 (D.C.Cir.1981), Judge McGowan, responding to plaintiffs' contention that there was no time like the present for resolving the takings issue, wrote:
 We think there is a better time: when and if the United States moves to dismiss the claims in District Court. The parties have not irretrievably lost their judicial remedies; rather, those remedies have been suspended pending arbitration.
 Before the doors of the court are forever closed to these appellees and those similarly situated, we presume that they will be able to argue that such relief as may be realized through arbitration has failed to make them whole and therefore that dismissal of their claims would constitute a compensable taking. At that time the District Court will be able to determine whether any taking has in fact occurred and, if so, what should be done.
 Id. at 448 (footnote omitted).
 
 
 [6]
 This case is readily distinguishable from Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). In Chevron, a personal injury case, the law governing the relevant statute of limitations changed after the case was filed but before trial. The filing was timely under the old rule, but not under the new one. The Chevron court declined to apply the new law retroactively as this would have wholly deprived the innocent plaintiff of his cause of action. See generally Johnson v. Lehman, 679 F.2d 918, 921 (D.C.Cir.1982), explaining Chevron. In the instant case, by contrast, defendants might have preserved their legal rights simply by complying with the law (Fed.R.App.P. 4(a)(4)) as it existed both before and after Griggs. As the essential rule of Chevron is not applicable here, we also do not apply the rule of Chevron's offspring, Marino v. Bowers, 657 F.2d 1363 (3d Cir.1981)
 
 
 [7]
 An appellate court may affirm a correct judgment of a lower court even where the lower court offered an inappropriate ground for decision. Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); Myers v. American Dental Association, 695 F.2d 716 (3d Cir.1982)