# Authority to Use United States Military Forces in Somalia

The President, in his constitutional role as Commander in Chief and Chief Executive, might reasonably and lawfully determine that it was justified to use United States Armed Forces personnel to protect those engaged in relief work in Somalia. His authority extended to using U.S. military personnel to protect Somalians and other foreign nationals in Somalia.

December 4, 1992

THE PRESIDENT
    THE WHITE HOUSE

MY DEAR MR. PRESIDENT: You have asked for my views as to your authority to commit United States troops to support and secure the humanitarian assistance effort currently underway in Somalia. I am informed that the mission of those troops will be to restore the flow of humanitarian relief to those areas of Somalia most affected by famine and disease, and to facilitate the safe and orderly deployment of United Nations peacekeeping forces in Somalia in the near future. I understand that private United States nationals and military personnel are currently involved in relief operations in Somalia. I am further informed that the efforts of the United States and other nations and of private organizations to deliver humanitarian relief to those areas of Somalia are being severely hampered by the breakdown of governmental authority in Somalia and, in particular, by armed bands who steal relief commodities for their own use.

I conclude that in your constitutional role as Commander in Chief and Chief Executive, you may reasonably and lawfully determine that the protection of those engaged in relief work in Somalia, including members of the United States Armed Forces who have been and will be dispatched to Somalia to assist in that work, justifies the use of United States military personnel in this operation. I further conclude that you have authority to use those military personnel to protect Somalians and other foreign nationals in Somalia. You have authority to commit troops overseas without specific prior Congressional approval "on missions of good will or rescue, or for the purpose of protecting American lives or property or American interests." 40 Op. Att'y Gen. 58, 62 (1941) (Jackson, A.G.). *See also* 53 Dep't St. Bull. 20 (1965) (President Lyndon Johnson ordered the United States military to intervene in the Dominican Republic "to preserve the lives of American citizens and citizens of a good many other nations."). As explained more fully in the

6

enclosed opinion of the Office of Legal Counsel, your authority thus extends to the protection of the lives of United States citizens and others in Somalia.

Apart from your constitutional authority, I conclude that ample statutory authority exists for the use of the military to engage in the distribution of humanitarian relief in Somalia. *E.g.*, 10 U.S.C. § 2551.

While not required as a precondition for Presidential action here, I also note that United Nations Security Council Resolution 794 authorizes the United States and other member nations to use "all necessary means" to establish a secure environment for humanitarian relief operations in Somalia and to provide military forces to that end. You may reasonably and lawfully conclude that it is necessary to use United States military personnel to support the implementation of Resolution 794 and other Security Council resolutions concerning Somalia.

Finally, I note that the proposed mission accords with the requirements of international law. United States forces will be acting consistent with Resolution 794, which has been adopted in accordance with Chapter VII, Article 42 of the Charter of the United Nations. Implementation of Resolution 794 will accord fully with the principle of non-intervention in matters that are "essentially within the domestic jurisdiction" of member States, inasmuch as that principle does not "prejudice the application of enforcement measures under Chapter VII." U.N. Charter art. 2(7). Resolution 794 makes it unnecessary to evaluate the proposed mission separately under principles of customary international law. I note, however, that given the urgent need for humanitarian assistance to Somalians and the breakdown of governmental authority in Somalia, the operation appears fully consistent with those principles.

Respectfully,

WILLIAM P. BARR
*Attorney General*

7

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have asked for our opinion whether the President has the legal authority to commit United States Armed Forces to assist the United Nations in ensuring the safe delivery of food, medicine and other relief to the population in affected regions of Somalia. We understand that the mission of those troops will be to restore as quickly as possible the flow of humanitarian relief to those areas of Somalia most affected by famine and disease, and to facilitate the safe and orderly deployment of United Nations peacekeeping forces in Somalia in the near future. We also understand that private United States nationals are currently involved in relief operations in Somalia and United States military personnel are engaged in humanitarian supply flights into Somalia. We further understand that the efforts of the United States and other nations and of private organizations to deliver humanitarian relief to those areas of Somalia are being severely hampered by the breakdown of governmental authority in Somalia and, in particular, by armed bands who steal relief commodities for their own use.[1]

In our opinion, the President's role under our Constitution as Commander in Chief and Chief Executive vests him with the constitutional authority to order United States troops abroad to further national interests such as protecting the lives of Americans overseas. Accordingly, where, as here, United States government personnel and private citizens are participating in a lawful relief effort in a foreign nation, we conclude that the President may commit United States troops to protect those involved in the relief effort. In addition, we believe that long-standing precedent supports the use of the Armed Forces to protect Somalians and other foreign nationals in Somalia. We also believe that the President, in determining to commit the Armed Forces to this operation, may lawfully look to the importance to the national interests of

---

[1] We note at the outset that the deployment of troops to Somalia appears primarily aimed at providing humanitarian assistance, and will only involve combat as an incident to that humanitarian mission. Thus, the current situation poses two questions: is there legal authority for United States Armed Forces to perform humanitarian tasks, and if so, may the President authorize those troops to engage in more purely military actions, such as self-defense and the creation of safe corridors for the provision of aid. We understand from the General Counsel of the Department of Defense that there is clear statutory authority for the use of the Armed Forces to support and to perform humanitarian tasks in Somalia. *See, e.g.*, 10 U.S.C. § 2551; *see also* 22 U.S.C. §§ 2292, 2292*l*. We conclude in this opinion that in these circumstances the President's constitutional authority to authorize the troops to engage in various related military actions is also clear. We do not address issues raised by the proposed operation under the War Powers Resolution.

the United States of upholding the recent United Nations resolutions regarding Somalia. Finally, we note that Congress has expressed its tacit approval for the President's exercise of his constitutional authority in this matter.

# I.

From the instructions of President Jefferson's Administration to Commodore Richard Dale in 1801 to "chastise" Algiers and Tripoli if they continued to attack American shipping, to the present, Presidents have taken military initiatives abroad on the basis of their constitutional authority. *See* Abraham D. Sofaer, *War, Foreign Affairs and Constitutional Power* 209-16 (1976); J. Terry Emerson, *War Powers Legislation*, 74 W. Va. L. Rev. 53, 88-110 (1971); James Grafton Rogers, *World Policing and the Constitution* 93-123 (1945); Milton Offutt, *The Protection of Citizens Abroad by the Armed Forces of the United States* (1928). Against the background of this repeated past practice under many Presidents, this Department and this Office have concluded that the President has the power to commit United States troops abroad for the purpose of protecting important national interests. *See, e.g., Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941) (Jackson, A.G.) ("the President's authority has long been recognized as extending to the dispatch of armed forces outside of the United States, either on missions of good will or rescue, or for the purpose of protecting American lives or property or American interests"). As the Supreme Court noted in *United States v. Verduqo-Urquidez*, 494 U.S. 259, 273 (1990), "[t]he United States frequently employs Armed Forces outside this country — over 200 times in our history — for the protection of American citizens or national security."[2]

At the core of this power is the President's authority to take military action to protect American citizens, property, and interests from foreign threats. *See, e.g., Presidential Powers Relating to the Situation in Iran*, 4A Op. O.L.C. 115, 121 (1979) ("It is well established that the President has the constitutional power as Chief Executive and Commander-in-Chief to protect the lives and property of Americans abroad."); *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 187 (1980) ("Presidents have repeatedly employed troops abroad in defense of American lives and property."); *see also* Memorandum of William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* at 8 (May 22, 1970) (President as Commander in Chief has authority "to commit military forces of the United States to armed conflict . . . to protect the lives of American troops in the field"). In *Durand v. Hollins*, 8 F. Cas. 111 (C.C.S.D.N.Y. 1860) (No. 4186), an American naval officer, under orders from

---

[2] *See Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (historical practice provides important evidence of scope of constitutional powers).

the President and the Secretary of the Navy, bombarded Greytown, Nicaragua, in retaliation for the Nicaraguan government's refusal to make reparations for attacks against United States citizens and property. In a suit brought against the naval officer, Justice Nelson held that the officer properly took this action, observing that such an attack on American citizens and property required the sort of swift and effective response that only the Executive could make:

> Acts of lawless violence, or of threatened violence to the citizen or his property, cannot be anticipated and provided for; and the protection, to be effectual or of any avail, may, not unfrequently, require the most prompt and decided action.

*Id.* at 112. Justice Nelson also stated that whether the President had a duty to act to protect the citizens involved "was a public political question . . . which belonged to the executive to determine." *Id. See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) ("I should indulge the widest latitude of interpretation to sustain [the President's] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society.").

Applying these principles to the present case, we conclude that the President can reasonably determine that the proposed mission is necessary to protect the American citizens already in Somalia. We understand that these include private United States citizens engaged in relief operations, and United States military personnel conducting humanitarian supply flights. The United Nations has determined that existing conditions in Somalia pose a threat to the lives and safety of these individuals and of non-Americans also engaged in efforts to deliver food, medicine and other relief to over two million Somalians. *See* Security Council Resolution No. 794, U.N. SCOR, 47th Sess., 3145th mtg., U.N.Doc. S\RES\794 (1992), *reprinted in* H.R. Rep. No. 89, 103d Cong., 1st Sess. 19 app. (1993) (determining that the Somali situation "constitutes a threat to international peace and security," and expressing alarm at "reports of violence and threats of violence against personnel participating lawfully in impartial humanitarian relief activities"); *see also* John M. Goshko, *U.N. Chief Favors Use of Force in Somalia*, Wash. Post, Dec. 1, 1992, at A1.

It is also essential to consider the safety of the troops to be dispatched as requested by Security Counsel Resolution No. 794. The President may provide those troops with sufficient military protection to insure that they are able to carry out their humanitarian tasks safely and efficiently. He may also decide to send sufficient numbers of troops so that those who are primarily engaged in assisting the United Nations in noncombatant roles are defended by others who perform a protective function. *See, e.g.,* Memorandum of William

10

H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* at 8 (May 22, 1970).

Nor is the President's power strictly limited to the protection of American citizens in Somalia. Past military interventions that extended to the protection of foreign nationals provide precedent for action to protect endangered Somalians and other non-United States citizens. For example, in 1965, President Lyndon Johnson explained that he had ordered United States military intervention in the Dominican Republic to protect both Americans and the citizens of other nations, *see An Assessment of the Situation in the Dominican Republic*, 53 Dep't St. Bull. 19, 20 (1965) ("to preserve the lives of American citizens and citizens of a good many other nations — 46 to be exact, 46 nations"). During the 1900-01 Boxer Rebellion in China, President McKinley, without prior congressional authorization, sent about 5,000 United States troops as part of a multi-national contingent to lift the siege of the foreign quarters in Peking after the Chinese government proved unable to control rebels. *Compilation of the Messages and Papers of the Presidents 1789-1902* at 113, 120 (James D. Richardson, ed. Supp. 1904).[3]

The United States has an additional important national interest arising from the involvement of the United Nations in the Somalian situation. In a 1950 opinion supporting President Truman's decision to support the United Nations in repelling the invasion of South Korea, the State Department concluded that "[t]he continued existence of the United Nations as an effective international organization is a paramount United States interest." *Authority of the President to Repel the Attack in Korea*, 23 Dep't St. Bull. 173, 177 (1950). We adopt that conclusion. Here, too, maintaining the credibility of United Nations Security Council decisions, protecting the security of United Nations and related relief efforts, and ensuring the effectiveness of United Nations peacekeeping operations can be considered a vital national interest, and will promote the United States' conception of a "new world order." *See, e.g.*, President's Address to the 46th Session of the United Nations General Assembly, 27 Weekly Comp. Pres. Doc. 1324, 1327 (1991).

In Security Council Resolution No. 794, which was adopted pursuant to Chapter VII of the United Nations Charter, the Security Council has authorized the United States and other member States to use "all necessary means" to establish a secure environment for the delivery of essential humanitarian

---

[3] A case of intervention on behalf of a foreign national, one Martin Koszta, was cited approvingly by the Supreme Court in *In re Neagle*, 135 U.S. 1, 64 (1890), as an example of the legitimate exercise of Executive power "growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution." *Id.* Although Koszta had expressed his intention of becoming naturalized, at the time of the events in question he was not an American citizen. He was seized by the Austrian government while in Smyrna and confined in an Austrian vessel. A United States naval officer demanded Koszta's surrender, and "was compelled to train his guns upon the Austrian vessel before his demands were complied with." *Id.* The Court noted that no Act of Congress sanctioned this armed intervention.

11

aid in Somalia.[4] The President is entitled to rely on this resolution, and on its finding that the situation in Somalia "constitutes a threat to international peace and security," in making his determination that the interests of the United States justify providing the military assistance that Security Council Resolution No. 794 calls for. Moreover, American assistance in giving effect to this and other Security Council resolutions pertaining to Somalia would in itself strengthen the prestige, credibility and effectiveness of the United Nations — which the President can legitimately find to be a substantial national foreign policy objective, and which will tend further to guarantee the lives and property of Americans abroad.

This conclusion accords with our prior opinions. During the Korean War, for example, we took the position that a Security Council resolution authorizing the use of force by member States to protect international peace and security could

> furnish a new ground for a decision by the President to use troops abroad.
>
> . . . .
>
> In the presence of such a resolution the President is bound to consider what the interests of the United States require. He will necessarily weigh the nature of the breach of the peace which has occurred, what its consequences will be for the United Nations if it goes unchallenged, and what it foreshadows in the way of an ultimate threat to the vital interests of the United States. In the light of these and other considerations he will then make the decisions which he, as President, must make.

Franklin S. Pollak, Power of the President to Send Troops Abroad, 34-35 (Apr. 27, 1951).[5]

---

[4] *Id.* ("Dismayed by the continuation of conditions that impede the delivery of humanitarian supplies to destinations within Somalia, and in particular reports of looting of relief supplies destined for starving people, attacks on aircraft and ships bringing in humanitarian relief supplies, and attacks on the Pakistani UNOSOM [U.N. Operation in Somalia Peacekeeping] [sic] contingent in Mogadishu"; "Noting the offer by Member States aimed at establishing a secure environment for humanitarian relief operations in Somalia as soon as possible"; "Calls on all Member States which are in a position to do so to provide military forces"; "Endorses the recommendation by the Secretary-General in his letter of 29 November 1992 (S\24868) that action under Chapter VII [authorizing use of force] of the Charter of the United Nations should be taken in order to establish a secure environment for humanitarian relief operations in Somalia as soon as possible").

[5] We do not conclude that a Security Council resolution calling on member States to provide troops to assist the United Nations by itself imposes any legal *duty* on the President to act in accordance with the resolution. But, as we explained in our 1951 memorandum, such a resolution can be an important factor on which the President may rely in determining whether national interests require such military action.

## II.

Finally, we note that the available evidence strongly suggests that Congress believes that the President's use of military force to assist United Nations relief and peacekeeping efforts in Somalia does not exceed his constitutional powers. In recent legislation, Congress appears to have recognized the President's authority to make use of military personnel, should he deem it necessary to carry out or protect humanitarian missions in Somalia. Section 3(b)(3) of the Horn of Africa Recovery and Food Security Act, Pub. L. No. 102-274, 106 Stat. 115, 116 (1992), states that "[i]t is the sense of the Congress that the President should . . . ensure, to the maximum extent possible and in conjunction with other donors, that emergency humanitarian assistance is being made available to those in need." Section 4(a)(1) of the Act states in part that U.S. policy should be "to assure noncombatants . . . equal and ready access to all food, emergency, and relief assistance," and section 4(b)(1) states that pursuant to the United States policy of "seeking to maximize relief efforts" the United States should "redouble its commendable efforts to secure safe corridors of passage for emergency food and relief supplies in affected areas." *Id.* at 117. Moreover, in section 2(3), Congress explicitly found that the actions of the government and armed opposition groups in Somalia "erode[d] food security" in that country. *Id.* at 115.

Thus, Congress appears to have contemplated that the President might find it necessary to make use of military forces to ensure the safe delivery of humanitarian relief in Somalia, and to have assumed in such circumstances that the President possessed constitutional authority to do so.[6] *See also Dames & Moore*, 453 U.S. at 678-79.

TIMOTHY E. FLANIGAN
*Assistant Attorney General*
*Office of Legal Counsel*

---

[6] As noted above, the quoted provisions of the Act are part of a "sense of Congress" resolution. A "sense of Congress" resolution does not, of course, give the President authority he does not otherwise possess. Nonetheless, we believe that the Congressional views expressed in the quoted portions of the Act are evidence that Congress recognized that the President has authority to use military force to accomplish the goals of the Act.

# OPINIONS

OF THE

# OFFICE OF LEGAL COUNSEL

14