MEAD, J.,
dissenting.
[¶ 40] I respectfully dissent. I do not disagree with the Court’s discussion of the history and statutes relating to the .establishment of the State Board of Corrections. I agree also with the Court’s statement of the central issue raised in this matter: “The issue presented here is where federal boarding revenue fit within the overall financial framework for the coordinated correctional system established by the Legislature.” Court’s Opinion ¶24. I agree that the answer turns on questions of statutory interpretation. Court’s Opinion ¶ 25.
[¶ 41] The legislative record is abundantly clear that the motivation behind the creation of the Board of Corrections was to reap the benefits afforded by centralized administration of the correctional services rendered by the state’s fifteen county jails, each of which was previously required to administer its own. incarceration, pretrial detention, and transport services. The Board was vested with broad authority to develop goals and processes to accomplish cost savings while serving overarching correctional objectives.
[IT 42] Maine’s criminal justice system requires the availability of short-term, lo-.eal. detention facilities. Each county -jail has historically provided these services with little or no collaboration or communication with other county jails offering identical services. As jail costs have risen, counties have struggled to shoulder onerous financial burdens. As the Court points out, the Board of Corrections was the Legislature’s response to the need to reconfigure the county jail system. Court’s Opinion ¶ 15.
[¶43] Several counties undertook to modernize their aging jail facilities prior to the creation of the State Board of Corrections and incurred substantial construction debt in the process. Although the record is less than, clear, it can fairly be inferred that Somerset County significantly overbuilt its new county jail with a clear intent to recoup construction costs by using its surplus capacity to house inmates from courts of other jurisdictions (principally the federal courts) and apply the.boarding fees to retirement of the construction debt. The boarding capabilities of the Somerset County Jail create a quasi-proprietary income-generating mechanism for the County..
[¶ 44] In April 2013, the Board of Corrections withheld the previously authorized disbursement due to Somerset County from the State Investment Fund after having been advised that Somerset County directed $445,547 in surplus federal boarding revenues to its Jail Capital Improvement Fund and existing jail debt. The Board predicated its action upon the assertion that federal boarding revenues fell within its exclusive purview and authority.
[¶ 45] Through the approach it took, the Board of Corrections overstepped its statutory authority and effectively appropriated these proprietary boarding fees. The Board treated the federal boarding revenues as though they were assets of the State Board of Corrections Investment Fund as established by 34-A M.R.S. *1019 § 1805 (2013).[15] For all of its forward thinking and planning, Somerset County’s reward was to have its earmarked debt-reduction funds diverted and replaced with the Board’s disheartening suggestion that it seek debt reduction funds through yet another tax on the residents of Somerset County. I do not believe the Legislature intended such a result, and I believe the plain language of the statute provided otherwise.
[¶46] The Board’s broad grant of authority established by 34-A M.R.S. § 1803 (2013) was clearly directed to the objectives of obtaining cost savings and encouraging efficiency within the county jails while accomplishing the jails’ core responsibility to house prisoners and pretrial detainees from the state judicial system.[16] No .language appeared anywhere within title 34-A, chapter 1, subchapter 5 suggesting that the Board was created to address any aspect of boarding federal detainees. Indeed, the only mention of federal detainees was found at 34-A M.R.S. § 1803(1)(C), which clearly proyid-' ed that the Board had no role in setting boarding rates for federal inmates.[17] Accordingly, the word “corrections” and the phrases “correctional services” and “correctional services funds,” 34-A M.R.S. §§ 1801-1806 (2013), must be viewed in the context of the jails’ duty to house inmates committed by the courts of the State of Maine. Thus, the revenue stream received by the county for housing detainees committed by the federal courts or courts of foreign jurisdictions was outside the scope-of authority of the Board of Corrections.
[¶ 47] The Court invokes 30-A M.R.S. § 924(3) (2012), which provided in part that “[ejorrectional services funds may be expended only for corrections services,”[18] for the proposition that
[f]ederal boarding revenue-consists of payments made by a federal agency to compensate a county for housing, transporting, and otherwise providing for federal prisoners. Those services are “correctional services” within the plain meaning of that phrase. Revenues generated by those services were therefore “correctional, services funds” and, under section 924, may have been used only for “corrections services.”
Court’s Opinion ¶ 27.
[¶ 48] I respectfully disagree with the Court’s reasoning. . The act of housing, *1020 feeding, and transporting federal prisoners while they are in custody may arguably be considered to be providing correctional services. However, the fact that a county receives contracted fees in return for those services that may, or may not, reflect the out-of-pocket value of such services, does not ipso facto establish that those monies are “correctional services funds.” Indeed, common usage would suggest that correctional services funds are those funds expended by the correctional facility, not the incoming funds that might, in the absence of the recently enacted statute, be applied to other noncorrectional ’debts or obligations of the governmental entity.[19]
[¶ 49] The Court correctly notes that Somerset County included federal boarding revenues in its budget request to the Board, and the Board based its funding allocations to the County based upon that budget request. Court’s Opinion ¶ 35. This action by the County would suggest that it accepted the notion that the Board had the authority to consider federal boarding revenues in allocating funding grants to the county jails. In the middle of fiscal year 2013, however, the County apparently changed its position regarding the Board’s authority over federal boarding revenues. While this midstream change of policy is clearly not conducive to positive inter-governmental relations, the fact remains that past practice, or past positions expressed, cannot create legal authority in the face of contradictory statutory provisions.[20] Stated otherwise, governmental entities cannot create authority, or erase authority, merely by establishing a practice or policy.
[¶ 50] The Board of Corrections argues quite properly that the State should not underwrite the costs of federal prisoners being held in the county jails. This issue could have easily been addressed, if either party had been so inclined, as part of the budget review process. The per capita expense for individual inmates could have been determined, and the budget then reduced by the cost of the number of federal prisoners anticipated to be housed during the budget term. Federal revenues would have been used to pay for federal prisoners; state revenues would have been used to pay for state prisoners. To the extent that the County realized a profit on its federal prisoners, that profit could have been directed toward any other purpose that the Commissioners deemed appropriate and that the law allowed.
*1021 [¶ 51] In this matter, both parties bear some responsibility for the new jail funding process devolving into dispute in Somerset County. The County’s fundamental change in its approach to the treatment of federal boarding revenues in the middle of a disbursement cycle signaled a potential crisis in the management of the State Investment Fund. The Board of Corrections had a powerful tool at its disposal,- however, to address any perceived overages paid to Somerset County — an adjustment during the next budgeting cycle. The Board’s error in exceeding its authority by including federal boarding revenues in its computations was compounded by its unilateral and punitive action of withholding previously authorized allotments to Somerset County. Although I reach this conclusion upon a rationale that differs slightly from that employed by the Superior Court, I am in full accord with the Superi- or Court’s finding that the Board acted in excess of its authority when it withheld payments from the Investment Fund with a stated purpose to prohibit use of any and all federal prisoner boarding revenues — and particularly amounts in excess of the budgeted $475,960 — for payments on jail debt or any other corrections-related purpose. I would affirm the Superior Court’s judgment vacating the decision of the Board of Corrections and remanding the matter to the Board for further proceedings to determine how the Board’s unmet obligations for fiscal year 2013 should be addressed.

. Title 34-A M.R.S. § 1805(3) (2013) designated sources of funds for the Investment Fund. It did not provide for boarding fees to be incorporated into the fund. Title 34-A M.R.S.'§§ 1801-1807 were repealed by P.L. 2015, ch. 335, § 27 (emergency, effective July 12, 20Í5).

. The county jails were and are under no legal obligation to accept detainees from any jurisdiction other than the State of Maine.

. Tide 34-A M.R.S. § 1803(1)(C) (2013) provided: “[Tjhe board is charged with the following responsibilities and duties .... [e]stablish[ing] boarding rates for the coordinated correctional system, except boarding rates for federal inmates.” . .

.Section 924 governed unencumbered surplus funds'remaining at the end of a fiscal year. It provided, in part:'
If not used for [designated higher priority] purposes, any remaining surplus funds may not be expended but must be retained as working capital for the use and benefit of the county except that correctional unencumbered surplus may' not lapse to the county’s noncorrectional fund balance but must be carried forward as the county or regional jail authority correctional services fund balance. Correctional services funds may be expended only for corrections services. , .
30-A M.R.S. § 924(3) (2012). Neither section 924, nor any portion of former title. 34-A, chapter 1, subchapter 5 defined "correctional services funds.” , <

. The Court opines that the Board had authority over funding sources as well as expenditures. Court’s Opinion ¶ 32. I respectfully disagree. Section 1803(1)(A) provided that the Board’s authority was limited to the following action: "Review, amend if necessary and adopt the correctional services expenditures in each county budget under Title 30-A, section 710." 34-A M.R.S. § 1803(1)(A) (2013) (emphasis added).

. Paradis v. Town of Peru, 2015 ME 54, ¶ 8, 115 A.3d 610 ("Administrative bodies ... are statutory in nature and can only have such powers as those expressly conferred on them by the Legislature, or such as arise therefrom by necessary implication to allow carrying out the powers accorded to them.” (quotation marks omitted)); Molasses Pond Lake Ass'n v. Soil & Water Conservation Comm’n, 534 A.2d 679, 681 (Me.1987) (”[I]t is axiomatic that State agencies may exercise only that power which is conferred upon them by law.”); MacDonald v. Sheriff, 148 Me. 365, 372, 94 A.2d 555 (1953) ("The Commission being purely a creature of statute is subject to the rule universally applicable to all bodies that owe their existence to legislative act. It must look to the statute for its authority.” (quotation marks omitted)); see also Medellin v. Texas, 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (saying that " ‘[p]ast practice does not, by itself, create power’ ” in the context of executive action by the President) (alteration in original) (quoting Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)).